THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.*
CHARLES E. STEWART and ROBERT D. STEWART,
Co-partners, trading as C. E. Stewart & Co.

*Construction of Contract—Action for Breach of Contract
—Measure of Damages—Evidence.*

A contract made by the plaintiffs with the Baltimore and Ohio
Railroad Company for furnishing the materials, and doing the
masonry work, in the construction of a bridge across Wheeling
Creek, provided that "Baltimore and Ohio specifications" should
govern, &c. The regular form of construction contract used by
the company, contained an agreement by which the company
might, at any time, suspend the execution of or annul the con-
tract, upon giving —— days' notice, without being liable for
any loss or damage to the contractors. The plaintiffs some five
years previous, had signed a contract of this kind with the com-
pany, had worked under and been governed by it. HELD:

That the words "Baltimore and Ohio specifications to govern"
did not import into the contract with the plaintiffs an agree-
ment that the company might, at its pleasure, annul the con-
tract, or abandon the work, without incurring any liability to
the plaintiffs for the losses which they might thereby suffer.

The right of the company to annul or abandon the contract at its
pleasure, under the agreement contained in its regular construc-
tion contracts, depended upon certain notice to be given to the
contractors, the length of the notice having been agreed upon
by the parties. HELD:

That where no such notice was given, or ever agreed upon by the
plaintiffs and the company, the latter could not annul the con-
tract or suspend work under it, without incurring liability to
the former.

Where, under a contract, work to be done for the defendant is
commenced by the plaintiffs, and is stopped by order of the
defendant, the measure of damages for the breach of the con-
tract is the difference between the amount which the plain-
tiffs would have been paid for the entire work when completed,
at the contract price, and what it would have cost them to do
and complete the same.

The fact that the plans for the erection of the bridge were sub-
ject to alteration at the will of the chief engineer of the de-

fendant, and that such alteration might essentially change the quantity of work to be done, and the profits of doing it, would not preclude the plaintiffs from recovering profits estimated according to the plans agreed upon, where there was no evidence to show that such alteration was very liable to occur.

One of the plaintiffs testified that they made an estimate of the cost of the work at contract prices, if completed, according to the plans furnished them by the chief engineer; that they calculated the number of cubic yards, according to the plans, and then multiplied the yards by the price in the contract, and that this result would give what it would have cost the company if the work had been finished. He got at the quantity of the different sorts of masonry by calculating each different part of it according to the plans. The witness then gave in detail the number of cubic yards of each kind of masonry, and the cost of each at the contract price, making the cost $42,870.04. He then gave the estimated cost of the different kinds of masonry to the plaintiffs, amounting to $19,576.91; and, deducting this amount from the contract price, he estimated that the profits would have been $23,293.13. HELD:

That there was evidence legally sufficient to prove a loss of profits.

APPEAL from the Court of Common Pleas.

The case is stated in the opinion of the Court.

*Exception.* —The plaintiffs offered the following six prayers:

1. That if the jury find from the evidence that the plaintiffs and the defendant company entered into the written contract offered in evidence and dated August 13th, 1890, for the construction of the masonry for Bridge 190, according to the plans and specifications shown to the plaintiffs at and before the signing of said contract; and that the plaintiffs made preparations to do the work required of them by said contract; that they began said work and proceeded with it for several months, and so long as they were permitted so to continue by the defendant company; that the defendant company caused the plaintiffs to discontinue said work, and ultimately compelled them to stop

it entirely, and refused to allow them to complete the same, although (if the jury so find) the plaintiffs were at all times ready and willing to go on with and complete said work, then such action on the part of the defendant company was a violation of said contract, and the plaintiffs are entitled to recover in this case such an amount as the jury may find will compensate them for the loss, if any, which they have suffered by reason of the stoppage of said work as aforesaid, the measure of damages being the difference between the amount which they would have been paid for the entire work when completed at the contract price, and what it would have cost the plaintiffs to do and complete the same.

2. That if the jury find from the evidence that the defendant company, in the summer of 1890, through its chief engineer, Henry T. Douglas, prepared a plan for a bridge to be built over Wheeling Creek, at the city of Wheeling, in West Virginia, describing said bridge as Bridge No. 190, which plan was subsequently modified in the manner testified to by the plaintiff, Charles E. Stewart, and the witness, Henry T. Douglas; that the plan for said bridge, which has been produced in evidence and described as "Blue Print," was shown to the plaintiffs, and that they were requested by said company, through its said engineer, to make a bid upon the work of furnishing the masonry and doing other work connected with the building of the abutments for said bridge; that the plaintiffs after investigating the matter of the cost for furnishing said masonry and doing said work, made certain proposals to the said chief engineer, and that after some negotiations between them it was finally agreed by and between the said railroad company, the defendant, through its said chief engineer, and the plaintiffs, that the plaintiffs should do the said work, furnishing the said masonry for Bridge No. 190, and that the terms of said agreement were subsequently embodied in the paper-writing offered in evidence,

dated August 13th, 1890, and signed by said Henry T. Douglas, chief engineer, and the said plaintiffs, except that it was further agreed that the said railroad company should furnish the cement necessary for said work, which portion of the agreement was not embodied in said paper-writing; and if the jury shall further find that the plaintiffs immediately proceeded to make the necessary preparations for the doing of the work and the furnishing of the masonry provided for in said agreement, and began the work of excavating for the foundations of the said bridge, as required by said contract, and continued upon said work so long as they were allowed to so continue by the defendant, but that the defendant, through no fault of the plaintiffs, subsequently compelled the plaintiffs to discontinue said work and ultimately declined to allow them to resume it, and that although, and if the jury shall so find, the plaintiffs were ready and willing at all times to go on and continue and complete the doing of the work and furnishing of the masonry provided for in said agreement, then the plaintiffs are entitled to recover in this case, and their verdict should be for the plaintiffs, so far as the Wheeling bridge work is concerned, for such a sum as will compensate them for the loss, if any, that the jury may find that the plaintiffs sustained owing to the failure and refusal of the defendant to allow them to complete the said work, and that the measure of damages is the difference between what the jury may find that the plaintiffs would have received under the contract, if the work had been completed, and what it would have cost them to have completed the work.

3. If the jury find from the evidence that the defendant company, through its engineer, entered into an agreement with the plaintiffs under which the plaintiffs were to do the work upon the bridge at Caldwell's Run, described in the testimony of the plaintiffs, Charles E. Stewart and Robert D. Stewart, the plaintiffs to be paid for the same

by being reimbursed the cost of the said work plus ten per cent. upon the cost thereof for all company work, and excavation upon said bridge, as explained in the plaintiffs' evidence, and that the rate of $8 per cubic yard for masonry, as stated by the plaintiffs in their testimony; and if they find that the defendant has failed or refused to pay the whole of said compensation provided for in said agreement, then the plaintiffs are also entitled to recover the same with interest, in the discretion of the jury; the measure of their recovery being the difference between what the jury may find that the said work cost the plaintiffs, with ten per cent. of said cost added, and what they may find that the plaintiffs have received from the defendant for the said work.

4. That there is no evidence legally sufficient to enable the jury to find that the defendant company reserved the right to stop the work mentioned in the contract of August 13th, 1890, at its pleasure, without becoming responsible to the plaintiffs for such loss as the jury may find under the Court's instructions that the plaintiffs sustained by reason of the stopping of said work.

5. That if the jury believe that the contract with reference to building Bridge 190, between the plaintiffs and defendant company, dated August 13th, 1890, does not contain the whole contract between said parties, it is for the jury to find from all the evidence in the case what said contract was, and if they find that it was no part of the said contract on the part of the plaintiffs that the defendant might stop the work mentioned in said paper of August 13th, 1890, at the pleasure of the said defendant, and without notice to the plaintiffs, then the defendant is liable for such damage as the jury may find, under the instructions of the Court, that the plaintiffs sustained by reason of the stoppage of said work by the defendant.

6. That unless the jury find that when the plaintiffs signed the contract of August 13th, offered in evidence,

the plaintiffs understood and intended to make the terms and conditions contained in the printed form of contract, part of said contract of August 13th, the defendant could not stop the work referred to in said contract of August 13th, without being liable to the plaintiffs for such loss and damage as the jury may find, under the Court's instructions, that the plaintiffs sustained by reason of the stopping of said work.

The defendant offered the following five prayers:

1. If the jury believe from the evidence that the words "Baltimore and Ohio specifications" in the letter from Col. Douglas to the plaintiffs of August 13th, 1890, referring to the work at Wheeling Creek, were understood by both parties as meaning the provisions of the regular form of contract of the defendant put in evidence by it, or the form put in evidence by the plaintiffs, as formerly signed by the plaintiff Charles Stewart, so far as applicable to work of the kind at Wheeling Creek, and including the provision for suspending the execution of and annulling the contract, and that the notice of the suspension and subsequent stopping of the work was at the time accepted by the plaintiffs without protest as sufficient under the terms of said contract, and their payments for work up to date of suspension were received by them, then said plaintiffs are not entitled to recover for loss or damage of any kind caused by the suspension or stoppage of said work at Wheeling Creek.

2. If the jury believe from the evidence that soon after the stoppage of the work at Wheeling Creek, and in view of that stoppage and its probable continuance, the chief engineer of the defendant railroad company gave work to the plaintiffs at Caldwell's Run, and that Caldwell's Run was in the immediate vicinity of Wheeling Creek, and the work was such as to afford employment for the same plant as that gathered together by plaintiffs for the Wheeling

Creek work, and shall further find from the evidence that the plaintiffs accepted said new work in lieu of the Wheeling Creek work and used in it the plant before mentioned, then the said plaintiffs cannot recover any damages for losses incurred in the bringing of said plant to Wheeling, and the failure to use it there.

3. If the jury find that the plaintiffs' claim for a loss of profits is based upon conjecture or speculation, then said plaintiffs are not entitled to recover for any such loss of profits.

4. If the jury find from the evidence that after the work at Wheeling Creek had been suspended, and the plaintiffs notified that it was not likely to be resumed for a whole season, the plaintiffs stayed at Wheeling and kept their plant or any part of it there in the hopes of getting the larger work on the proposed new line, then the said plaintiffs cannot recover for any loss caused by their remaining at Wheeling, or keeping said plant there after said notice.

5. If the jury find that the plans for the Wheeling bridge were not final, but were subject to alteration, at the will of the chief engineer of the defendant railroad company, and that such alteration might essentially change the quantity of the work to be done and the profits in doing it, and that such alteration was very liable to occur, then the plaintiffs cannot recover any profits calculated upon the amount of masonry to be done, and the cost of doing it under said plans.

The Court (PHELPS, J.) granted the plaintiffs' first, second, third, fourth and fifth prayers, and the defendant's second, third and fourth prayers, and rejected the plaintiff's sixth prayer and the defendant's first and fifth prayers.

The defendant excepted specially to the granting of the first, second, third, fourth and fifth prayers of the plaintiff, because there was no evidence in the case legally sufficient to sustain them, in that there was no evidence in the case

legally sufficient to prove a loss of profits by the plaintiffs. This exception the Court overruled. The defendant excepted to the ruling of the Court, in granting the plaintiffs' first, second, third, fourth and fifth prayers, and in rejecting its first and fifth prayers, and to the overruling of its special exception. The verdict and judgment being for the plaintiffs, the defendant appealed.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, PAGE, MCSHERRY, BOYD and BRISCOE, J.

*W. Irvine Cross* (with whom was *John K. Cowen,* on the brief,) for the appellant.

*William L. Marbury,* and \*Charles Marshall, for the appellees.

ROBINSON, C. J., delivered the opinion of the Court.

This is an action by the appellees, plaintiffs below, against the Baltimore and Ohio Railroad Company to recover damages for the breach of a contract made by them with the company for furnishing the materials and doing the masonry-work in the construction of a bridge across Wheeling Creek, in West Virginia, and also to recover a balance due them for work at Caldwell's Run.

The defendant company being about to build the bridge in question, its chief engineer, Col. Douglas, submitted the plans for the bridge to the plaintiffs and requested them to make a bid on the masonry-work. Having made the necessary inquiries in regard to the cost of materials, labor, &c., the plaintiffs, on the 19th July, 1890, submitted their bid to Col. Douglas. After some bargaining the prices to be paid for the various kinds of masonry were agreed upon, and without waiting for a written contract, the plaintiffs

---

\*The Court declined to hear Mr. Marshall.

immediately began their preparations for the work, and began moving their plant and machinery from Lancaster, Pennsylvania, to Wheeling. Afterwards, on the 13th August, the plaintiff, Charles E. Stewart, came to Baltimore, and the following written contract, prepared by Col. Douglas, was signed by the parties:

" *Baltimore*, August 13th, 1890.

" MESSRS. CHARLES E. STEWART & CO.

" Gentlemen:—Your proposal to do the work at Wheeling for masonry, Bridge No. 190, W. P. & B. R. Ry., is accepted. Baltimore and Ohio specifications to govern, at the following prices:

| | |
|---|---|
| Coping, per cubic yard, | $15.00 |
| 2d class bridge masonry, per cubic yard | 7.00 |
| Rubble walls, per cubic yard | 5.50 |
| Concrete, per cubic yard | 3.50 |

" For timber, iron and workmanship on coffer dams, and excavation in coffer dams, cost and ten per cent., not to include any cost of pumping. Any cost required to be done in taking care of trestles now in place to be paid for at cost.

" Yours truly,

" (Signed)      H. T. DOUGLAS.
*Chief Engineer.*

" Accepted:    (Signed) CHARLES E. STEWART & CO."

In pursuance of this contract the plaintiffs began work at once upon the excavation for the abutments, and had been engaged upon it nearly two months when, by the direction of Col. Douglas, they suspended work for that season, owing to the rainy weather and high water. At the time of the suspension of the work, says Col. Douglas in his testimony, there was no intention of abandoning the

building of the bridge. "It was suspended for the reason that the season and the water rendered it both advantageous to the company as well as to the contractors, that the work should be suspended."

Early in September, the plans for the bridge were changed by omitting the piers, which would have been built in the middle of the stream, and to this change the plaintiffs made no objection.

In the following spring, when the weather was again open, the plaintiffs, after waiting, as they thought, a reasonable time, notified the defendant company of their readiness to proceed with the work. They were told that the company was not ready at that time to have the work resumed, and things went on in this way for several months, the plaintiffs in the meantime being engaged upon other work for the company at "Caldwell's Run" and Grafton. Being put off from time to time, with first one excuse and then another, the plaintiffs, having come to the conclusion that the company did not intend to have the work completed, by letter of January, 1892, demanded of it compensation for the losses which they had suffered from the breach of the contract by the company. In reply to this demand, Col. Douglas took the ground that the company had a right, under its contract with the plaintiffs, to abandon the work *at pleasure*, without incurring *any liability to them* for the loss which they might thereby suffer. In the regular form of construction contract used by the company—a carefully prepared instrument, with a number of provisions, limitations, and the most minute and detailed specifications, descriptive of materials, manner of work, &c., occupying no less than twenty pages of the record—we find an agreement by which the company may, at any time, suspend the execution of, or annul, the contract, upon giving——days' notice, without being liable for any loss or damage to the contractors. And the plaintiffs, it appears, about five years ago signed a contract of this

kind with the company, and the contention is, that the words *"Baltimore and Ohio specifications to govern"* completed and made definite the contract now sued on, by importing into, and making a part of it, all the provisions of the regular contract. And the question is whether, looking to the terms of the contract itself, and the subject-matter to which it refers, and the circumstances under which it was executed, there was any evidence from which the jury could find an agreement between the parties, that the defendant might, at its pleasure, annul the contract, or abandon the work without incurring any liability to the plaintiffs for the losses which they might thereby suffer. It can hardly be contended that any such right on the part of the defendant can be implied from the words " Baltimore and Ohio specifications to govern." The term " specifications " as thus used in contracts of this kind, ordinarily means a detailed and particular account of the structure to be built, including the manner of its construction, and the materials to be used. And the words " Baltimore and Ohio specifications to govern " would in themselves be construed as meaning that the parties to the contract were to be governed, as to such matters, by the specifications to be found in the regular form of construction contracts used by that company. Nor is it pretended there was any mutual agreement or understanding, outside of the written contract in regard to this point. The plaintiffs assert most positively that there was no such agreement, and that they would not have undertaken the work but for the most positive assurance, given to them, that it would be completed. The plaintiff, Mr. Charles E. Stewart, says it was not so understood, and that he never heard that the term " specifications " was intended to give the defendant the right to abandon the work at pleasure, until he got Col Douglas' letter of January 20, 1892, after the company had finally stopped the work. He further says he was entirely familiar with the specifications of

the Baltimore and Ohio work, in the ordinary sense, having done work for the company before, and knew what kind of materials were ordinarily required by it for its bridges, and therefore had no difficulty in knowing what was meant by "Baltimore and Ohio specifications."

Col. Douglas, it is true, in answer to the question as to what was understood between the plaintiffs and himself by "specifications," &c., when the contract was signed, says "the terms and conditions of the regular form of the construction contract used by the company." But he goes on to say: "My reason for so stating" is, Mr. Stewart was "entirely familiar with that form of contract, and the specifications of the Baltimore and Ohio Railroad, having worked under them, and having been governed by them under my directions." And in reply to the question whether the provisions of the regular contract were recognized by the plaintiffs and himself, in their dealings during the progress of the work, says: "They were most distinctly recognized by me, and I assumed that they were recognized by Mr. Stewart, as I believe they were." Col. Douglas no doubt meant by the words "Baltimore and Ohio specifications to govern," not only the specifications, but all the conditions of the regular form of the contract used by the company, so far as applicable, and he assumed that the plaintiffs so understood these words. The latter, however, are in no manner bound by the assumptions or belief of the witness. They are bound by the contract itself, construed by the same rules of law which govern all other contracts. And, besides, the right of the defendant to annul or abandon the contract at its pleasure, under the agreements to be found in its regular construction contracts, depends upon certain notice to be given to the contractors, the length of the notice having been agreed upon by the parties. And, in this case, it is not pretended that any such notice was given, or ever agreed upon by the plaintiffs and defendant. So, it does not seem to us that there

was any evidence from which the jury could find that by the words "Baltimore and Ohio specifications to govern," that the parties meant to import into the contract the reservation, to be found in the regular construction contracts of the company, of the right to annul the contract at its pleasure, without incurring any liability to the plaintiffs. As to the instruction of the Court in regard to the measure of damages, namely, that the plaintiffs are entitled to recover such an amount as the jury may find will compensate them for the loss, if any, which they may have suffered by reason of the stopping of the work by the defendant, the measure of damages being the difference between the amount which they would have been paid for the said work when completed, at the contract price, and what it would have cost the plaintiffs to do and complete the same, we do not understand there is any real objection. This is the rule recognized by the current weight of authority. As was said by Mr. Justice Curtis in *Phila. Wilm. & Balto. Railroad Co. vs. Howard*, 13 *Howard*, 307, "in case of a contract like this, that loss is, among other things, the difference between the cost of doing the work and the price paid for it. This difference is the inducement and real consideration which causes the complainant to enter into the contract. For this he expends his time, exerts his skill, uses his capital, and assumes the risks which attend the enterprise."

Or as stated in the still later case of *United States vs. Behan*, 110 *U. S.*, 339, "the *prima facie* measure of damages for the breach of a contract is the amount of the loss which the injured party has thereby sustained; if the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damages, namely: First, what he has already expended towards performance (less value of materials on hand); secondly, the profits that he would

realize by performing the whole contract. * * * If he goes also for profits, then the rule applies in Speed's case, and his profits will be measured by the difference between the cost of doing the work and what he was to receive for it."

The defendant, however, insists that if the plans for the bridge were subject to alteration at the will of its chief engineer, and that such alterations might essentially change the quantity of work to be done, and the profits of doing it, and that such alterations were liable to occur, then the plaintiffs are not entitled to recover any profits calculated upon the amount of masonry-work to be done, and the costs of doing it under said plans, and so asked the Court to instruct the jury.

Now, in the first place, there is no evidence to show, in the language of the instruction, that *"such alteration was very liable to occur."* The plans had been prepared with great care, and the classification of the masonry—that is, the quantity of each kind of masonry to be used in the various parts of the bridge—were made by the local engineer. Col. Douglas says the plans *"might have been changed,"* but he does not say there was any *probability* that they would be changed. And, besides, even if the plans were changed, the possibility that such alterations might affect the profits of the plaintiffs would not disentitle them from recovering profits estimated according to the plans agreed upon. They might not be able to prove with *absolute* certainty what their profits would have been. But the law does not require them to prove such profits with absolute certainty. All they were required to prove was that the profits claimed were *reasonably certain* to have been realized but for the wrongful act of the defendant. Where the completion of a work, like the one, the subject-matter of this contract, has been prevented, the profits to be realized cannot in the nature of things be proved with absolute certainty, and no greater

degree of proof is required in such cases than in other civil actions. In this case the plans had been changed once, with the consent of the plaintiffs, and their estimate of profits was based upon the alteration thus made. And, in the absence of other changes likely or probably to be made, the jury had the right to estimate the damages, or in other words, the profits, upon the basis that the masonry-work would be built according to the plans agreed upon.

The defendant's special exception to the instructions granted by the Court on the ground that there was no evidence legally sufficient to prove a loss of profits, was also, we think, properly overruled.

The plaintiff Stewart testifies that they made an estimate of the cost of the work at contract prices, if completed, according to the plans furnished them by the chief engineer; that they calculated the number of cubic yards, according to the plans, and then multiplied the yards by the price in the contract, and that this result would give what it would have cost the company if the work had been finished. He got at the quantity of the different sorts of masonry by calculating each different part of the masonry, according to the plans. The witness then gave in detail the number of cubic yards of each kind of masonry—that is, of coping, of second-class masonry, and of rubble—and the cost of each at the contract price, making the cost $42,870.04. He then gave the estimated cost of the different kinds of masonry to the plaintiffs—first, building the masonry-work, that is, cost of labor, and then cost of materials, &c., amounting to $19,576.91, and, deducting this amount from the contract price, he estimated the profits would have been $23,293.13. A very liberal profit it may be. These estimated profits were liable to be affected, it is true, by many causes—bad weather and losses by freshets. There might be room for argument as to the amount of profits, which the plaintiffs would have realized, but the Court could not say to the jury, in the face of all

the evidence upon this point to be found in the record, that there was no evidence to show that they would have made any profit. The verdict of the jury was in favor of the plaintiffs for $13,600, and whatever ground of complaint the defendant may have as to the amount of the verdict, we have been unable to find any error in the several instructions granted and refused by the Court.

*Judgment affirmed.*

(Decided 21st June, 1894.)