(Decided December 21st, 1898.)

---

## L. L. BUSH & COMPANY *vs.* THE BALTIMORE AND CATONSVILLE CONSTRUCTION COMPANY OF BALTIMORE CITY.

*Contracts—Measure of Damages when Defendant puts an end to Contract for Work—Estimated Profits.*

When the plaintiff has been engaged to do certain work for the defendant and the latter breaks the contract, the plaintiff's measure of damages is the difference between the contract price and what it would have cost the plaintiff to do the work.

The contract between the plaintiffs and defendant provided that plaintiffs should deliver a large quantity of gravel for ballast on the railway being constructed by defendant. The contract was broken by defendant's refusal to proceed with it, and plaintiffs claimed as damages an estimated profit of fifty cents a yard upon 56,000 cubic yards, which he alleged was the quantity to be delivered under the contract. Defendant contended that the contract was for the delivery of only

25,000 cubic yards, also that plaintiffs would not have been able to deliver that quantity within the time specified, and that even if the contract had been performed plaintiffs would not have made any profit. *Held:*

1st. That according to its true construction the contract was for the delivery of 25,000 cubic yards of gravel within a certain time.

2nd. That a preponderance of evidence establishes that plaintiffs were able and ready to deliver the gravel within the time specified.

3rd. That according to the testimony of most of the witnesses plaintiffs would have made a profit if they had been permitted to complete the contract and that they are entitled to recover the same.

Cross appeals from a decree of the Circuit Court No. 2 of Baltimore City (WICKES, J.) awarding damages to the amount of $10,000 to L. L. Bush & Co. upon their claim filed in a case in which receivers had been appointed for the Construction Company.

The cause was argued before McSHERRY, C. J., BRYAN, BRISCOE, PAGE and BOYD, JJ.

*John N. Steele* and *William H. Buckler,* for the Construction Company.

*Joseph Packard, Jr.,* for L. L. Bush & Co.

BRISCOE, J., delivered the opinion of the Court.

These cross appeals are from a decree of Circuit Court No. 2 of Baltimore City allowing damages for the alleged breach of a contract for the delivery of gravel for ballasting a line of railway between Laurel and Paint Branch, Maryland.

L. L. Bush and Co., the claimants or plaintiffs below, were railroad contractors and during the year 1896 made two contracts with the Baltimore and Catonsville Construction Company, the defendant below, and a

corporation which had been chartered for the purpose of constructing a double-track electric railway between Baltimore and Washington, D. C., for the Columbia and Maryland Railway. There was no dispute as to the balance due upon the contract for grading four miles of road between Laurel and Muirkirk, Maryland. This amount was paid and is not therefore involved in these appeals.

But the controversy here grows out of the contract to ballast the road with gravel between Paint Branch and Main street at Laurel and for the breach of which Bush and Company claimed damages to the extent of $28,000. The Court below awarded them the sum of ten thousand dollars with interest from August 30, 1896, and costs, and from this decree both parties have appealed.

The plaintiffs' claim is based upon an estimated profit of fifty cents on 56,000 cubic yards of gravel which they contend would have been made by them had the contract not been broken and they had been permitted to complete it.

The claim is resisted by the Baltimore and Catonsville Construction Company upon three grounds, as alleged by them:

First, because the Construction Company only contracted for the delivery of 25,000 cubic yards of gravel.

Second, because the plaintiffs, Bush and Company, were not ready, able and willing to deliver the 25,000 yards contracted for by the 30th of August, 1896, and could not have performed their contract.

Third, because even if they were able and willing to perform the contract they could not have made any profit.

The law applicable to a case like this has been definitely settled. In *U. S.* v. *Behan,* 110 U. S. 344, the Supreme Court says: " The *prima facie* measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract without the fault of the other party, who

is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damages, namely, first, what he has already expended towards performance (less value of materials on hand); secondly, the profits that he would realize by performing the whole contract. If he goes also for profits, then the rule applies in *Speed's case* (8 Wall. 77), and his profits will be measured by the difference between the cost of doing the work and what he was to receive for it."

And this Court, in the recent case of *Baltimore & Ohio R. R. Co.* v. *Stewart*, 79 Md. 499, in adopting the rule established by the Supreme Court in *Behan's case, supra, Speed's case*, 8 Wall., and in *P. W. & B. R. Co.* v. *Howard*, 13 Howard 307, says: "The plaintiffs are entitled to recover such an amount as the jury may find will compensate them for the loss, if any, which they may have suffered by reason of the stopping of the work by the defendant, the measure of damages being the difference between the amount which they would have been paid for the said work when completed, at the contract price, and what it would have cost the plaintiffs to do and complete the same."

We come then to a consideration of the facts of the case, as contained in the record. The contract or specifications for gravel ballast, is in these words:

"The gravel to be screened, clean gravel, free from sand, loam, clay or other foreign substances; the greatest diameter of any stone not to exceed two inches, and the least to be not less than one-fourth of an inch. To be delivered on the road-bed of the Columbia and Maryland Railway between Paint Branch and Main street, at Laurel, and spread in two beds of ten feet each in width, and eight inches in depth, conforming to stakes which will be furnished. Also, two rows of gravel to be piled on the outside of the beds sufficient in quantity to measure 3/10 of a cubic yard in each row per linear foot.

"Deliveries to commence on or before June 13th, 1896, and to be completed on or before August 30th, 1896, and not less than 8,000 cubic yards shall be deliv-

ered and spread as aforesaid, within any one month from the date specified for the first delivery. The rails of the Columbia and Maryland Railway Company will be allowed to be used in distributing the ballast, provided the contractors return the rail in the like condition as when delivered them. The 85-lb. rail will be delivered on the B. & O. cars at Muirkirk; the contractors to take it at this point. And for doing and performing said work in the manner and in the time aforesaid, the said Baltimore and Catonsville Construction Company agrees to pay to said L. L. Bush & Co. one dollar and fifteen cents ($1.15) per cubic yard, measured when delivered and spread and piled upon the road-bed of the Columbia and Maryland Railway aforesaid.

" Payments to be made on the 15th of each month for the deliveries made in the previous month, less 10%, which percentage shall be reserved until the contract has been completed, and when said contract has been completed and accepted by the said Columbia and Maryland Railway, if within the time and manner herein specified, The Baltimore and Catonsville Construction Company will pay to the said L. L. Bush and Co. the balance due under this agreement, it being distinctly understood and agreed that the time is made the essence of this agreement.

" Should said L. L. Bush & Co. fail to deliver the quantity of gravel per month hereinbefore stipulated, the President of the Baltimore and Catonsville Construction Company shall, and he is hereby authorized, to contract for such ballast as may be required to comply with the terms of this contract, applying the same and deducting the cost thereof from any moneys due or to become due to said L. L. Bush and Co. under this contract.

" As witness our hands, this 29th day of May, 1896.

L. L. Bush & Co.    (Seal)

By P. D. Peters.

The Baltimore Catonsville Construction Company,

By H. T. Douglas, President."

While these specifications may be somewhat indefinite as to the quantity of gravel to be delivered, yet the specifications and correspondence between the parties when taken together, we think, clearly indicate that the contract was for the delivery of 25,000 yards, and not for 56,000 as contended for by the plaintiffs.

It appears from the letter of Col. Douglas, the president of the company, dated May the 15, 1896, that he writes as follows: " In reply to your favor of the 15th " (meaning a letter from the plaintiffs), " I will be glad to receive a proposal from you for furnishing and spreading on the line of this road between 6th and Main street, at Laurel and Paint Branch, say 25,000 yards of broken stone for ballast."

And in reply to this letter, Bush and Company write on May 20th: " We are prepared to deliver to you from 25,000 to 40,000 yards of clean screened gravel for ballast at rate of 300 to 600 yards per day; delivery to commence within two weeks from date of contract."

And on June 8th, in reply to an application by Bush & Co. for an extension of time for the delivery of the gravel, Col. Douglas writes: " I cannot extend the time for the delivery of ballast beyond August 30th.    If you begin delivery June 15th, it will give you 75 days and you ought, in this time, to *deliver 25,000 cubic yards.*"

These letters, with the other testimony upon this branch of the case, sustain the construction placed upon the contract by the defendants, that the plaintiffs were to deliver only 25,000 yards of gravel.    The 56,000 yards are nowhere mentioned in either the specifications or the correspondence between the parties.

We come now to the defendant's second objection and that is as to the ability and readiness of plaintiffs to perform the contract by August 30, 1896.

The evidence upon this question is somewhat conflicting, and we will quote from such parts of it as we find necessary for the decision of this case.

Now it is admitted that the work was stopped by direction of the defendant corporation in its letter of July 30th, in which it is stated: " Until further notice

suspend the delivery of gravel ballast under your contract with this company, signed, H. T. Douglas, President."

It also appears that at this time the plaintiffs (Bush and Co.) had expended for the cost of the plant erected by them to execute the contract, the sum of $12,500, in addition to the cost of the steam shovel which they had on hand, aggregating the sum of $13,008.76.

The witness Whitman testified that by working ten hours per day and ten hours per night for say twenty-two days, making allowance for Sundays and rainy days, would credit the steam plant with 34,000 yards, leaving 22,000 yards of material to be hauled by other means.

And in reply to sixteenth question, " would it have been possible for L. L. Bush and Company to have completed with the plant and appliances at their disposal, the delivery of 56,000 yards by August 30, 1896; if yea, state in detail how you reach your conclusion, and give figures showing cost? " says: " Yes, sir; the following statement which has been prepared by me will show the estimated cost of furnishing the gravel under the contract and the details as to the time necessary; it will cost per day of ten hours to handle the screening plant, inclusive of steam shovel, locomotive and cars, and teams for hauling away the waste material."

The witness Sloan, surveyor of Baltimore City, who made a personal examination of the gravel pits or beds along the line of the railway and the plant of Bush and Company which had been erected for this work, testified :

" 10 q. Suppose, on July 29th, 1896, they had delivered 480 yards, would you or not think it possible for them to supply the remaining 55,520 yards required by the contract, by August 30th, 1896?

A. Yes, sir; I do.

11 q. What, in your judgment, between the 29th day of July, 1896, and the 30th day of August, 1896, would be a proper allowance for days of actual work excluding Sundays and rainy days?

A. I should say about 22 or 23 days.

12 q. Supposing the temporary stoppage of their

steam screening plant, say 10 per cent. of the time, would you or not think it possible under such conditions to complete the contract within the time?

A. Yes, sir; my reason for saying so would be the number of different pits accessible and the quantity of gravel in each one.

13 q. What would be the average haul to the line of the railway by available county roads from the pits which they would need to use in the completion of their contract?

A. About one mile; the average of all the pits would probably amount to less than one mile."

The witness, Baldwin, a railroad contractor, and who had experience since 1862, in the construction of railway and similar work, also testified:

" 4 q. The contract of L. L. Bush and Company calls for the delivery of 56,000 cubic yards of clean gravel on the line of said railway between the points referred to in my former question, on or before August 30th, 1896; from your observation of these gravel pits, of the plant for delivery and the surroundigs generally, what have you to say as to their ability to perform said contract as to quantity and as to time?

A. As far as the quantity is concerned they have got abundance from the pits that I saw to ballast three times as much road; as to time, there is nothing to hinder them from putting that amount of gravel on the road in 25 or 30 working days, and even in less time, if necessary."

And in line with the testimony of these witnesses, we have that of the claimant Peters and the witness Carlin.

But it is contended upon the part of the Construction Company, that because the steam plant had delivered only 600 cubic yards of gravel and only 480 yards had been accepted by the company, from June 15th to July 29th, that it would have been impossible for Bush and Company to have completed the contract within the time limit. This view is sustained by the two witnesses for the company, Riley and Schoepf.

But while the preponderance of evidence is clearly

against this contention yet if it be conceded for the purposes of this case that the steam plant was insufficient to perform the work within the time limit, it does not follow that the contract could not have been otherwise carried out.

Mr. Sloan, the city surveyor, who had experience on an actual contract in the same section, testified that the contract could have been performed, within the time limit, by working the steam plant to its fullest capacity, and at the same time working all the other pits; the pits on the lower end of the line are scattered around in such shape that they could be worked at the same time, by stationary screens and teaming it with wagons.

" 6 r. x. q. The cost of screening and delivering the balance of this gravel provided for in the contract would depend to a considerable degree upon the success with which that steam screen operated, would it not?

A. Not entirely so.

7 r. x. q. If the screen worked successfully and did all that a steam screen of that make under proper conditions could ever do, it would have enabled them to have fulfilled that contract at a considerable less cost to themselves, and consequently with more profit than if they had been compelled to do it by hand screens or in some other way?

A. No doubt about that; but here are some of these pits that can be worked by stationary screen almost as cheap as that could be worked."

The claimant, Peters, also testified as follows:

" 86 x. q. You had not the screen ready in time to deliver the gravel according to contract?

A. Not until the latter part of July could we deliver from that screen up to its full capacity.

87 x. q. Your contract called for the delivery of not less than 8,000 cubic yards per month, and you were not in condition to make such deliveries until the latter part of July?

A. We were in condition, but we did not do it; we were not altogether dependent on that screen.

88 x. q. How could you do it then?

A. With teams and carts."

Looking then to the entire evidence, we think, the plaintiffs have proved they were both able, ready and willing, to perform the contract of the 29th of May, 1896, and could have delivered the 25,000 yards of gravel within the time required by the contract.

The next and last point for consideration is whether the plaintiffs could have made any profit on this contract. It is a clear rule, says the Supreme Court in *P. W. & B. R. R.* v. *Howard*, 13 How. 344, that the gain or profit of which the contractor was deprived by the refusal of the company to allow him to proceed with and complete the work, was a proper subject of damages. " And in case of a contract like this that loss is, among other things, the difference between the cost of doing the work and the price to be paid for it, . . . and to deprive him of it, when the other party had broken the contract and unlawfully put an end to the work, would be unjust."

According then to the testimony of all the witnesses except two, the plaintiffs would have made a profit if they had been permitted to complete the contract.

The witness Peters puts the profit at 50 cents per cubic yard. Whitman places it at 49½ cents. Sloan estimates it at 45 cents, and Baldwin at from 45 to 55 cents per cubic yard. The witness Sloan stated that he had a subcontract under E. D. Smith and Son for building the tracks of the Columbia and Maryland Railroad from Howard street to the Calverton Road, and completed about one mile of track using screen gravel ballast supplied under the same specifications just quoted from the contract of L. L. Bush and Company: " while executing that contract I purchased screened gravel according to those specifications, delivered in the neighborhood of Saratoga street and Mount street, for 80 cents per cubic yard, measured in the carts on the work, which was hauled from Bond's Hill bounding on Druid Hill Park, a distance of about three miles; I also purchased other gravel from different parties at a much less figure which was hauled a shorter distance."

"8 q. What would be the additional charge for spreading gravel, as required in the contract of L. L. Bush and Company?

A. I should say at an outside figure about nine cents per cubic yard.

9 q. Can you estimate from your observation of the pits and their surroundings, and of the plant and apparatus installed by L. L. Bush and Company for the purpose of carrying out their gravel contract, what would have been the cost to them of completing said delivery under the contract?

A. I have made a rough calculation from the location of the different pits and the quantity of gravel in each one, that their contract could have been completed within the time limit for 70 cents per cubic yard, including royalty, which I understand to be 10 cents per yard."

The witness Baldwin also testified:

" 5 q. What would be your judgment from your experience in such matters, as to the cost to them per cubic yard of delivering such gravel, including a royalty of 10 cents per cubic yard?

A. I never figured the distances up and made a net calculation of it, but from my observation and from the measurements which I took from the various pits, I would be safe in saying that they could put it in place for 70 cents per cubic yard; it could be put there for 10 cents less if the additional track, I might call it a switchback, was built from the screen to the shovel to bring the empty cars back, and that is what they proposed to do."

It follows, then, from this construction of the contract that the decree below is correct, and it will, therefore, be affirmed, each party to pay one-half the costs in this Court and the Court below.

> *Decree affirmed, each party to pay one-half of costs in both Courts.*

(Decided December 21st, 1898.)