**HUBLER RENTALS, INC. and Cyrus Gutman and Benson N. Schamblan, Receivers for Hubler Rentals, Inc., Debtor, and I. Cyrus Gutman, Trustee for Hubler Rentals, Inc., Bankrupt, Plaintiffs,**

v.

**ROADWAY EXPRESS, INC., Defendant.**

**Civ. A. No. 72–250–M.**

United States District Court, D. Maryland.

Sept. 19, 1978.

J. Cookman Boyd, Jr. and James P. Whattam, Baltimore, Md., and Malcolm L. Lazin and Morris L. Chucas, Philadelphia, Pa., for plaintiffs.

David F. Albright and Charles R. Moran, Baltimore, Md., for defendant.

## OPINION

JAMES R. MILLER, Jr., District Judge.

This diversity of citizenship action is one which illustrates the dangers sometimes involved in attempting to be too shrewd in the exercise of a legitimate right. After carefully reviewing the thousands of pages of transcripts and exhibits in this case, the Court has concluded that the defendant, Roadway Express, Inc. (hereinafter referred to as "REX"), is liable to the plaintiff, Hubler Rentals, Inc. (hereinafter referred to as "Hubler"), because REX did not act in accord with the contract between the parties in terminating the contract after a breach had been committed by Hubler. While the result seems harsh, it is one which follows directly from the terms of the contract upon which REX, as well as Hubler, agreed.

This opinion is intended to constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52, F.R.Civ.P., even though not expressly so designated.

## THE FACTS

### I. The Parties

Plaintiff ("Hubler")[1] was a corporation incorporated under the laws of the Commonwealth of Pennsylvania and having its principal place of business in the Commonwealth of Pennsylvania. At the times relevant to this action Hubler Rentals was engaged in the business of leasing trucks and other vehicles to customers who made use of these trucks and other vehicles in the operation of their businesses.

Defendant ("REX") is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in the State of Ohio. REX is duly qualified, licensed, and authorized to do business in the State of Maryland and has appointed a resident agent for the service of process in Maryland.

Hubler was a family owned corporation whose actual operating chief during the years 1968 through 1974 was Heydon W. Hubler, who had the title of Executive Vice President. During those years, Ronald N. Hubler was the Vice President and Treasurer of Hubler Rentals, Inc.

During the years 1969 through 1971, the Chairman of the Board and Chief Executive Officer of REX was Galen J. Roush; its President was J. Robert Wilson; and its Treasurer was Charles F. Zodrow. All of these men have law degrees and, in addition, Mr. Zodrow is an accountant.

In 1970 and 1971, Otto E. Liipfert was the Executive Vice President of Field Operations of REX. At the time of the trial of this case Mr. Liipfert was the President of REX.

In 1970 and 1971, William F. Spitznagel was the Vice President of the Northeastern Division of REX, which Division included Laurel, Maryland. At the time of the trial Mr. Spitznagel was Executive Vice President of Field Operations of REX.

In 1970 and 1971, Harold L. Turner was the District Manager of REX, which district included Laurel, Maryland. In December, 1973, Mr. Turner resigned from the employ of REX.

In 1970 and 1971, Frank G. Stone was the Terminal Manager at Laurel, Maryland. In

---

1. Subsequent to the institution of this suit, Hubler became the subject of proceedings in the United States District Court for the Eastern District of Pennsylvania, Case No. 75–789, for an Arrangement under Chapter XI of the Bankruptcy Act. By order of this Court on January 19, 1976, I. Cyrus Gutman and Benson N. Schamblan, as Receivers for Hubler Rentals, Inc., were made additional parties plaintiff and additional parties counter-defendant (Paper No. 76). Still later Hubler was declared a bankrupt, and this Court ordered the joinder of I. Cyrus Gutman, as Trustee for Hubler Rentals, Inc., Bankrupt, as an additional party plaintiff and counter-defendant (Paper No. 103).

1973, Mr. Stone resigned from the employ of REX.

Roger H. Blevins was the Assistant Terminal Manager at Laurel for REX during January 1971, to July 1971. In July 1971, Mr. Blevins took on the position of Terminal Manager at the newly opened Baltimore terminal of REX. In January, 1974, Mr. Blevins resigned from the employ of REX.

Bernard Ridilla was, during all years relevant to this action, Driver Superintendent at REX's Laurel terminal.

J. B. Pardue was the fleet manager for REX at its Laurel terminal.

## II. The Agreement

On or about June 13, 1968, Hubler entered into a written lease and service agreement[2] (the "Agreement") by which it agreed among other things to lease to REX, a common carrier in interstate commerce, seventy-two (72) trucks for a period of six (6) years.

The vehicles included under the Agreement consisted of twenty-four (24) Ford N–700 straight trucks and forty-eight (48) Ford N–950 single axle tractors. These vehicles were delivered to REX's Laurel, Maryland terminal on various dates between September 16, 1968, and October 8, 1968, as indicated on Schedule "A" to the Agreement, and were to be used by REX as the Pick-up and Delivery (hereinafter "P & D") fleet at that terminal. A list of these vehicles, (hereinafter referred to as the "leased vehicles") with REX and Hubler identification numbers, was received in evidence as Exhibit P–2.

The vehicles in the P & D fleet stationed at REX's Laurel terminal were used to deliver freight arriving at the terminal to final destination points in the Baltimore-Washington area and to pick-up freight consigned to REX by shippers in the Baltimore-Washington area for ultimate transportation interstate. The freight which was to be delivered by the P & D fleet arrived at the Laurel terminal from points out of state aboard REX's interstate or "line-haul" vehicles. This freight would be unloaded from the line-haul vehicles and loaded aboard P & D vehicles for ultimate delivery. The freight which was picked up in the Baltimore-Washington area would be brought to the Laurel terminal, unloaded from a P & D vehicle, and then reloaded aboard a line-haul vehicle for transportation to the ultimate point of destination.

REX and Hubler began negotiations for the Lease and Service Agreement in 1967. These negotiations were conducted by several representatives of both parties, including Mr. John Mears of Roadway Express, Inc. and Mr. Ronald Hubler of Hubler Rentals, Inc.

In paragraphs 2 and 6.b. of the form of lease proposed in 1968 by REX, a covenant of the lessor was included under which the lessor was required to maintain each vehicle so as to enable the lessee to conduct "normal *and uninterrupted*" operations. (Emphasis supplied). Paragraphs 2 and 6.b. of the Agreement as finally signed by the parties in this case provided for a covenant of the lessor to maintain each vehicle so as to enable REX to conduct "normal" operations.[3] The variation between paragraphs 2

**2.** Plaintiff's Exhibit 1. Hereinafter plaintiffs' exhibits are designated as "P– " and defendants' exhibits as "D– ".

**3.** The full texts of paragraphs 2 and 6.b. as finally adopted read:
 "2. *Service of Vehicles*:
 Lessor and Lessee recognize: (a) the objective of this agreement is that Lessee may use satisfactorily the vehicles leased hereunder so as to enable it to conduct normal business operations; (b) that service and maintenance of the vehicles are essential to that objective; (c) that Lessee is financially able to purchase

the vehicles leased hereunder; but (d) that Lessee chooses to lease the vehicles from Lessor as an inducement to Lessor for its *efficient service and maintenance thereof.*"
 "6. *Lessor Covenants*:
 * * * * * *
 "b. *Maintenance and Service*:
 "To maintain at its expense each vehicle leased hereunder in good repair in all respects, so as to enable Lessee to conduct normal operations; to furnish at its expense all motor oil and other lubricants, labor, parts, supplies, tires; tire service, road ser-

and 6.b. of the Lease Agreement and the 1968 form of agreement proposed by REX was the result of a request made by Hubler for the variation.

Under paragraph 6.c. of the Agreement Hubler covenanted as follows:

"c. *Substitute Vehicles* :

"*To repair promptly, on notification by Lessee to Lessor* at its service facility designated in Schedule 'A', *any vehicle leased hereunder which may become inoperable or within a reasonable time to substitute therefore temporarily*, at the same rental charges and terms, *another vehicle* of substantially equivalent type and capacity. For each full work day that Lessor is unable to provide a substitute vehicle, rental charge on the leased vehicle will abate at the rate of one-fifth (1/5th) of the 'Rental Charge Per Week,' Schedule 'A', and *Lessor's liability in the event of failure to supply a substitute vehicle shall be limited to the abatement of the rental, but this limitation shall not relieve Lessor of its liability under 8.f.2., Breach by Lessor.* The rental, however, shall not abate in any week in which Lessee shall have had the use of the vehicle or a substitute vehicle for at least five (5) days." (Emphasis supplied).

Paragraph 8.b. of the Agreement provided that it could be terminated prior to its planned expiration date only by a breach by one of the parties as set out in paragraph 8.f. or by lessor's election under paragraph 8.d.1. (relating to increased costs at specified future times and lessee's refusal to pay increased rates). Paragraph 8.f.2., referred to in paragraph 6.c. above and relating to termination of the Agreement as a result of a breach by Hubler, provided:

"2. Breach by Lessor:

"a. *Lessee's Right to Terminate: If Lessor* breaches any term or condition of this agreement, *Lessee may give written notice to Lessor specifying with substantiating evidence the na-*

vice, winterizing, washing, and any other materials and services necessary to enable Lessee to conduct normal operations; and at its

*ture, time, place, circumstances and all other available information relevant to the breach* ; and *if Lessor has not cured such breach as of the close of business on the twentieth (20th) calendar day* following Lessee's mailing the aforesaid notice, *Lessee may forthwith terminate this agreement as of the next day*, namely, the twenty-first (21st) calendar day following Lessee's mailing such notice, by written notice of termination mailed to Lessor, and such twenty-first (21st) calendar day shall be designated as the 'Termination Date'; and any obligation of Lessee to Lessor for 'Rental Charge Per Week' and 'Rental Charge Per Mile', Schedule 'A', columns 9 and 11, respectively, applicable to any vehicle leased hereunder, shall cease to accrue as of the 'Termination Date'. *Each of the aforesaid notices shall be in duplicate sent by United States certified or registered mail, one copy addressed to Lessor at its principal office* designated in the first paragraph of this agreement and *the other copy addressed to Lessor at its service facility* designated in Schedule 'A'." (Emphasis supplied).

On its part REX covenanted in the Agreement to facilitate the maintenance by Hubler of the leased vehicles in good repair in a number of ways. Paragraph 7, in pertinent part, provided:

"7. *Lessee Covenants* :

"a. *Careful and Competent Drivers* : That *all vehicles shall be operated by safe, careful and licensed drivers* at least 21 years of age, selected, and employed and controlled by Lessee, who shall be agents of Lessee only and whose wages and expenses as such shall be paid by Lessee. *Lessee shall require the drivers to operate the vehicles with reasonable care and diligence, and to use every reasonable precaution to prevent loss or damage thereto.* Upon

expense to pick up and return each vehicle at Lessee's terminal address designated in Schedule 'A' for servicing and repair."

written information from Lessor specifying reckless, careless, or abusive handling of any vehicle leased hereunder, Lessee shall, subject to the provisions of its applicable labor contracts, remove such driver. *Lessee shall obtain a written report from each driver each day on the condition of any vehicle leased hereunder operated by him, and Lessee shall immediately inform Lessor at its service facility* designated in Schedule 'A' *as to each report of faulty condition.*

"b. *Availability for Maintenance:* Lessee shall make available to Lessor at least eight (8) hours each week at such time as will not interfere with Lessee's operations, each vehicle leased hereunder for purposes of maintenance and servicing.* The vehicles shall be based at Lessee's terminal address designated in Schedule 'A' and may not be transferred to another basing point without Lessor's written consent.

\* \* \* \* \* \*

"d. *Emergency Service:* If any vehicle leased hereunder breaks down while in possession of Lessee,* its employee or agent, Lessee shall not attempt any repairs or adjustments thereto. *Lessee shall immediately notify Lessor at its service facility* designated in Schedule 'A', and shall abide by Lessor's directions concerning emergency repair, service, or other disposition, and shall not hold Lessor liable for any expense not expressly authorized by Lessor, nor for any expense resulting from the miring or bogging down of any vehicle leased hereunder while in possession of Lessee, its employee or agent.

"e. *Notification of Accident or Loss:* Lessee, its employee or agent shall immediately notify Lessor at its service facility* designated in Schedule 'A' *of any accident or seizure or loss of any vehicle leased* hereunder, presenting complete details as to time, place, persons, personal injuries and deaths, vehicles, property damage and witnesses.

\* \* \* \* \* \*

"j. *Illegal or Improper Use:* Lessee,* its employee or agent, shall use any vehicle leased hereunder only in the course of Lessee's business; shall not use nor permit any such vehicle to be used for illegal purposes; *shall not load any such vehicle in excess of its maximum GVW* (Gross Vehicle Weight) *or GCW* (Gross Carrying Weight) designated in Schedule 'B–1', 'B–2' and 'B–3' as applicable, or propel or tow any other vehicle, other than in the course of the normal operation of a tractor with a trailer. Lessee shall be liable for and shall indemnify and hold Lessor harmless from all loss, damage, expense and liability arising from any of the aforesaid illegal or improper uses." (Emphasis supplied).

Hubler was informed during the negotiations that REX could use the provisions of paragraph 8.f.2. to notify Hubler of any unsatisfactory performance under the Agreement and, if Hubler did not correct its unsatisfactory performance, REX could terminate the Agreement pursuant to the terms of paragraph 8.f.2.

Immediately prior to the signing of the Agreement and for a substantial period of time prior thereto, the P & D fleet which REX had operated from its Laurel facility was owned by REX and maintained by REX mechanics. As a condition of entering into the Agreement, REX required Hubler to hire its mechanics to service the leased vehicles. Hubler was also required as a condition of entering into the Agreement to purchase from REX sixty of the vehicles which had previously constituted the P & D fleet at the Laurel terminal. These vehicles were old, badly deteriorated and in poor mechanical condition (P–4).

During the negotiations between Hubler and REX, Hubler was informed that one of REX's purposes in entering into the Agreement was to improve the maintenance of its P & D vehicles and that it wanted good serviceable equipment in this important area of its business. Hubler was further informed at that time that if the P & D fleet was not properly maintained, REX

could not get the vehicles on the road, its drivers would refuse to drive them, the vehicles would break down and, as a result, Roadway would lose shipments, have angry customers, and lose revenues.

As an inducement to Hubler to enter into the truck lease and service contract, REX agreed to lease to Hubler its garage and parking facilities in Laurel, Maryland. The Hubler service facility contemplated by the Agreement and identified in "Schedule A" thereto is the property located at 72 Marshall Avenue in Laurel which was to be leased to Hubler by REX. The garage and parking areas were leased to Hubler by an oral lease for which Hubler has paid the agreed rental in full. Hubler was permitted under the garage lease to base additional vehicles there, over and above those leased to REX under the Agreement, for lease to the general public and for lease to REX as "extras".

The parties contemplated at the time of entering into the Agreement that Hubler would have an unspecified number of vehicles stationed at Laurel, in addition to the 72 leased vehicles but of the same specifications, in order that vehicles would be available to REX as substitutes and, if not previously leased to the public as a part of the Hubler daily rental fleet, as "extras". Hubler, to carry out this understanding, initially domiciled at Laurel 28 additional vehicles of the same specifications as the 72 REX leased vehicles. During 1971, Hubler removed approximately 11 of these vehicles from the Laurel terminal and brought in 3 or 4 other vehicles as part of the daily rental fleet.

The parties agreed orally on October 23, 1968 that Hubler personnel would fuel the leased vehicles with REX fuel at a rate to be paid to Hubler of 3½ cents per gallon for that service and related record keeping services (P–5). That agreement was followed for the vehicles located in Laurel through November 8, 1971. At the same time it was orally agreed that Hubler would perform requested repair work at the Laurel terminal on REX owned tractors and trailers which were either stationed in or passing through Laurel at a rate of $8.00 per hour on labor and Hubler's "cost plus 15%" on parts (P–5). On or about March 10, 1969, the parties agreed that, in addition to fueling and servicing the leased vehicles, Hubler would fuel and service (i. e., check oil, water and battery) any REX "line-haul vehicles" which REX presented for fueling and servicing at the Laurel terminal for the same rate of 3½ cents per gallon of gas pumped.

Pursuant to the Agreement and ICC regulations, each time a REX driver operated a leased vehicle, he was required to make a written report with respect to its condition, one copy of which would be furnished to Hubler by REX and another copy of which would be retained by REX. These reports were known as "M–11's". On December 9, 1968, the then Vice President of Operations for REX wrote a letter (P–7) to Hubler in which he stated, among other things:

"Proper maintenance is, of course, the joint responsibility of Roadway and the Lessor. We recognize our responsibility to properly notify you, the Lessor, of any defects noted by the driver during each day's operation. There is a company procedure established and in use at every terminal to accomplish this. Once notified of a defect, we anticipate prompt and proper repair so that the vehicle will be suitable for continued operation."

## III. The Development of the Dispute

In mid 1970, REX obtained statements from two former employees and one then current employee of Hubler that REX fuel was being converted on a systematic basis on the orders of Kenneth Vining, the Hubler terminal manager at Laurel, (D–1A, 1B, 1C). The alleged procedure involved the fueling of Hubler daily rental vehicles at the REX pumps at times when those vehicles had not been used by REX as substitutes or "extras". The statements also described alleged tampering with speedometer mileage readings by use of a reversible drill and overcharges of REX by Hubler for repair work. In October, 1970 an audit was completed by REX personnel to attempt to

determine the validity of the allegations in reference to theft of fuel. The audit concluded that over a five month period in 1969 and 1970 fuel, approximating 5600 gallons, was used for purposes other than those of REX (P-9).

The alleged gasoline conversion was discussed with Heydon Hubler by REX administrators shortly after the completion of the audit. He accepted the evidence produced by REX that fuel conversion had occurred and in November, 1970, fired Kenneth Vining, the Hubler terminal manager at Laurel (tr. 2373-4, 3489). When called to testify as a witness in this case, Vining, who had been terminal manager at Laurel from October, 1968 until his discharge, refused on Fifth Amendment grounds to answer any questions regarding the alleged conversion of REX fuel (tr. 6214-6236). Vining was replaced as terminal manager at Laurel for Hubler by Len Savidge (tr. 2374).

In 1970, REX management decided as a matter of corporate policy to switch from leased to company owned vehicles in its P & D fleet around the country (tr. 1491-94). At that time, the Hubler lease at Laurel for 72 vehicles was the largest lease both REX and Hubler had. REX had become convinced that leasing, as a general matter, was not working favorably for it because its general experience was that maintenance of the leased equipment by the lessors declined as the equipment became older as well as because leasing was not available in some of the smaller markets served by REX (tr. 1491-94).

The change in REX policy, together with the deterioration in the relationship with Hubler as a result of the allegations of fuel conversion and other improprieties, caused Otto Liipfert, then executive vice president in charge of operations, to conclude in late 1970 that REX should try to end the Hubler truck lease in Laurel (tr. 1511-19).

A meeting was arranged for January 5, 1971, ostensibly for the parties to discuss a number of the problems then festering. Hubler had certain unpaid invoices it wished resolved, but the major matters to be discussed as far as the REX people were concerned were the alleged fuel conversions and overcharges and the possibility of terminating the lease in some fashion. By that time, the leased vehicles, then over two years old, were beginning to have mechanical problems (D-133(1)—D-133(m), D-182) and REX terminal personnel were complaining that batteries and tires were needed on many of the trucks. Liipfert had previously talked with Spitznagel, Division Vice President, and instructed him to "feel out" Heydon Hubler about a possible termination of the Agreement (tr. 1512).

Present at the meeting of January 5, 1971 were an attorney for REX who had spearheaded the investigation of the alleged gasoline thefts, Spitznagel, Harold Turner, Heydon Hubler and one or two other REX and Hubler employees (tr. 6092-3, P-98).

After going over the statements with Heydon Hubler which REX had obtained from Hubler employees, Spitznagel said that REX was not pleased with the relationship at Laurel and broached the subject of REX buying the leased P & D fleet. Heydon Hubler replied in effect that the only way REX could end the Agreement was "to pay the agreed upon or Schedule A value" (tr. 1514, 2375, 6093, P-98). He went on to say that Hubler would reimburse REX for any alleged theft or other irregularity only when proof was presented to Hubler of the theft or irregularity as to the particular item for which reimbursement was sought (tr. 2375, 6093, P-98). In view of Hubler's attitude in insisting that any purchase by REX of the leased vehicles be at the price set out in the Agreement, Spitznagel dropped the subject. It was agreed that a REX auditor would meet Heydon Hubler at Hubler's main office to review fuel slips and rental records to attempt to reach agreement on the alleged fuel conversion.

On January 7, 1971, a meeting took place between the REX auditor and Heydon Hubler, but no agreement was reached. Hubler insisted that the original REX audit had not considered the use by REX of "extra" vehicles and the meeting ended by the REX auditor telling Heydon Hubler that

"Akron" (the REX headquarters) would contact him. No further efforts were made to reach agreement on the fuel allegations, and REX never submitted to Hubler a claim for reimbursement prior to suit being instituted in 1972.

Spitznagel reported to Liipfert that Hubler was apparently adamant that REX would have to pay the "Schedule A" value if it wished to purchase the Laurel P & D fleet. Liipfert, in turn, told Charles Zodrow, the REX treasurer, of Hubler's position. Liipfert told Zodrow that something should be done soon to end the Agreement and that he felt REX should buy Hubler's trucks (tr. 1514–16, P–10). Zodrow, whose responsibility it was to decide whether to buy the Hubler fleet or attempt to end the Agreement in some other way, told Liipfert that all the factors to be weighed would have to be documented. Liipfert, in February, ordered an appraisal of the leased vehicles and told Spitznagel that he wanted documentation of complaints which were being made by REX personnel of lack of maintenance service by Hubler at Laurel.

Down the chain of command went an order to keep records for a period of time of the response of the Hubler maintenance personnel at Laurel to the M–11's as well as records of the circumstances of street breakdowns and yard delays. Stone, the terminal manager for REX, had already started to keep records of the maintenance problems. On February 17, 1971, Spitznagel sent a report to Liipfert for the period from January 4 to January 25, 1971, which showed an average of three breakdowns a day. In his memo (P–11), Spitznagel went on to say:

"As I see it, we have three choices, (1) buy them out, (2) kick them out on the basis of their breach in the contract by not supplying satisfactory equipment and maintenance, and (3) live with what we have and try to make the best of it.

"If we have to follow the course number three, we should take over the gassing of the units ourselves and of course, keep maximum pressure on Hubler to get the most we can out of this bad deal.

"I would recommend course number one if we would not take too much of a beating on the buy-out cost of the equipment versus its actual worth."

Although Liipfert and Spitznagel were in favor of buying the Hubler P & D fleet at Laurel, Zodrow did not want to move hastily. Matters rocked along at Laurel pretty much as they had for the previous months. Several self-serving memos were sent to the Hubler terminal manager at Laurel by the local REX personnel complaining mildly about maintenance problems (D–2, D–3), but no major events occurred to precipitate additional conflict.

By June, 1971, REX had decided to open a terminal in Baltimore in order to improve its service. The Baltimore terminal was to serve the Baltimore area while the Laurel terminal was to be limited to service of the Washington area. Harold Turner called Heydon Hubler to ask him about transferring 25 to 30 of the 72 leased vehicles from Laurel to Baltimore. After also talking to Charles Zodrow about the transfer, Heydon Hubler agreed to the transfer on certain conditions (tr. 2391–2397, P–83). When Turner and Zodrow stated that REX would assume responsibility for checking and adding oil as well as for fueling at the terminal in Baltimore, Heydon Hubler agreed to reduce the added fee he had originally stated (tr. 2394). Since there was no garage facility at the Baltimore terminal for Hubler to use, it was agreed that Hubler would send mechanics from Laurel at least twice a day to work out of a parts and service truck to service the Baltimore P & D fleet and that major repairs would still be made at Laurel until Hubler opened a garage facility in Baltimore (P–1, Schedule A Revision of September 16, 1971, P–83). In July, 29 of the leased vehicles were moved to Baltimore.

During the negotiations, in which Spitznagel may have participated (tr. 6142–3), relative to the transfer of vehicles to Baltimore, none of the REX personnel mentioned a problem of lack of maintenance at Laurel to Heydon Hubler (tr. 2452, 3067, 6142–3).

On August 23, 1971, a letter (D–3) was sent by Frank Stone to Len Savidge, with a copy to Heydon Hubler. This letter dealt with an occasion when there was an altercation between Bernie Ridilla, the REX driver superintendent at Laurel, and Savidge. This is the only letter produced in evidence from REX officials of which the original or a copy was sent to Heydon Hubler or the Hubler main office, prior to a memo of November 17, 1971 (P–18), which related in anyway to alleged problems with maintenance of the P & D fleet. After reciting the reason for Ridilla's anger precipitating the incident which was the subject of the letter, the letter went on to say as follows:

> "Further, a major portion of the entire fleet is not being serviced properly and I have documented this time and time again. For example, the tires right now are badly worn, some of them beyond the point of being safe."

While it is not clear that receipt by Heydon Hubler of a copy of this letter caused Hubler to investigate and correct conditions relating to worn tires, the fact remains that in October and November, 1971, most of the P & D vehicles at Laurel were fitted with new tires (tr. 5946, D–83, D–84, D–133(x)).

The next contact between the headquarters personnel of Hubler and officials of REX relative to problems concerning the Agreement occurred on November 10, 1971. Although there is conflicting evidence as to who called the meeting, it is clear that the meeting occurred at the Laurel terminal. Attending the meeting on behalf of Hubler were Heydon Hubler, Walter Smallets (Credit Manager), Len Savidge and George Riehle (Insurance Manager for Hubler). Attending for REX were Harold Turner, Frank Stone, Donald Hargett, J. B. Pardue, and Bernie Ridilla.

The initial portion of the meeting was occupied by negotiations relating to outstanding invoices from Hubler to REX. The invoices, after a period of discussion, were compromised. There was also a discussion of an engine failure which Hubler contended was caused by negligence of a REX dispatcher in ordering a REX driver to drive a leased truck when the instrument panel showed no oil pressure. Discussion additionally took place concerning a truck which had been wrecked by a REX driver on July 31 as to which there had not yet been an agreement reached concerning the cost of repair.

Another subject discussed at the meeting was the question of fueling. Although Turner testified that he met with Heydon Hubler and told him that REX was going to take over fueling in Laurel for the reason that Hubler personnel were not getting the REX trucks fueled in time for them to leave for their routes in the morning (tr. 5090–1), in actuality the Turner letter of October 18, 1971, written approximately one week after the final signing of the Agreement Amendment allowing the transfer of 29 vehicles to Baltimore, notified Heydon Hubler that REX unilaterally had decided to begin fueling all its leased vehicles at Laurel, effective November 8, 1971, for the "primary reason" that additional REX equipment at Laurel was going to require Diesel fueling, necessitating a REX employee with fueling responsibility (P–13). In the letter, no hint was made that Hubler was improperly performing the fueling up to that time. The letter went on to state that although REX employees would do an oil check on every leased unit fueled at the time of fueling and could add oil, if needed, from supplies to be furnished by Hubler, REX would assume no responsibility for engine damage as a result of lack of oil. In a memorandum to Liipfert, dated October 27, 1971, Spitznagel implied that the real reason that REX was taking over the fueling in Baltimore was to deprive Hubler of the fee of 3½ cents per gallon in an effort to attempt to force Hubler to agree to negotiate a termination of the Agreement and to allow REX to purchase the leased vehicles at a price below that set out in "Schedule A" (P–14). On November 1, 1971, Heydon Hubler wrote to Harold Turner stating that he would not agree to REX assuming responsibility for fueling unless it also would accept the responsibility for engine failure resulting from lack of oil (P–76). At the November 10th meeting, Hey-

don Hubler insisted that REX be responsible for engine failure for damage as a result of lack of oil. There apparently was an ambiguous statement made by Turner that REX might be responsible for engine damage to the same extent as was the case then in Baltimore at which time Heydon Hubler decided not to try to prevent REX from taking over the fueling at Laurel until he saw the exact terms which Turner said REX would put in memorandum form stating its final position on fueling (tr. 3237–9). The written REX position on fueling and responsibility for engine failure was not sent to Heydon Hubler at the same time as Turner's memorandum of November 17, 1971 (P–18), reciting the subjects discussed at the meeting.

The discussion at the meeting of November 10, 1971 finally turned to the subject of the maintenance of the leased vehicles by Hubler. Heydon Hubler was given a memorandum purporting to point out needed repairs on six leased vehicles which were in the yard that morning (P–129). Heydon Hubler's response was that REX was harassing his company and that the level of maintenance provided by Hubler at Laurel was as good as any lessee could expect. He further maintained that the REX drivers were abusing his company's equipment. Eventually, Heydon Hubler stated that he wanted to go out in the yard to see the equipment listed on the memorandum which had been given to him that morning and he invited Harold Turner to go with him in order that they could jointly inspect the vehicles. Although the reason that Harold Turner did not go is in dispute, all agree that Harold Turner did not go out into the yard and did not inspect the equipment with Hubler. The other REX personnel, together with the Hubler personnel present at the meeting, went out into the yard. Hubler agreed in the course of the inspections that certain repairs should be made, primarily to air hoses, and noted other items were a result of driver abuse, generally expressing the view that REX was "nit-picking". Tempers flared, and Hubler again accused REX of harassing his company. During the discussion, Hubler

stated that "if Roadway wants an all out war, they will get it." (tr. 2381–87, P–17). The Hubler and REX officials parted, each going their separate ways.

Harold Turner testified that he came out into the yard after the vehicle inspection was over and that he and Heydon Hubler walked over to the wash bay area of the garage at which time he told Heydon Hubler that the maintenance problems were so great that he was turning the whole matter over to REX headquarters for resolution (tr. 5149–57). According to Turner, his impression was that Heydon Hubler did not believe or realize that the leased vehicles were in as bad a condition as Turner felt they were (tr. 5153), but Turner nevertheless did not show to him any of the records which REX had then compiled relating to the performance of the P & D fleet. The memorandum of November 17, 1971, which Turner sent to Heydon Hubler describing the substance of the meeting of November 10, did not dwell on the maintenance problem and appeared to deemphasize that aspect of the discussions. Certainly the memorandum did not give any hint that Harold Turner was throwing up his hands and turning the entire question of maintenance over to the REX headquarters. The memorandum after summarizing the discussions which took place at the meeting, stated in pertinent part:

"I believe this recaps it all except your visit to the yard. I did not expect that any agreement on items for repair in your judgment were urgent as it would be in our judgment, so I am sure that nothing was gained by that tour other than remarks that were uncalled for. For that reason, I chose not to go along anyway.

However, it is our intent to work along with Mr. Savidge as best that we can as long as both he and Hubler live up to their side of the coin. I hope the above recap is as you remember it. You will be hearing, under separate cover, about the invoices to be passed on for payment to our general offices. If I can be of further assistance, please advise." (P–18).

No one other than Turner testified about any separate conversation between Turner and Heydon Hubler on November 10. The Court is persuaded that if any such conversation did take place between Heydon Hubler and Harold Turner on November 10, Harold Turner did not alert Heydon Hubler that the REX main office was about to deal with alleged breaches of the Agreement with Hubler in the area of maintenance of the leased vehicles.

In truth, the attitude of REX was secretive in that Mr. Zodrow and Mr. Spitznagel were fearful that Hubler would cease maintaining the equipment altogether if Hubler learned that REX wished to buy it or, alternatively that Hubler would "cover [its] flanks extremely well" (P–14) if it learned that REX was intending to declare a breach of the Agreement. From all of the credible evidence in this case, the Court infers that Mr. Zodrow, who was the REX official with ultimate decision making authority in this area, devised a strategy of putting pressure on Hubler to attempt to force it to come to REX with an offer to sell the equipment and terminate the Agreement and, failing that, of documenting breaches of the Agreement on the part of Hubler for the purpose of terminating the Agreement without letting Hubler know what was happening. Frank Stone reflected the strategy in his memorandum of November 17, 1971, a copy of which went to Spitznagel, relating to the November 10 meeting. He said:

"Harold [Turner], Don Hargett and myself had discussed the whole situation prior to the meeting. Of course, at that point we were the only three who were informed of the possible eventual attempt to buy out the equipment or attempt to abort the lease. We knew in advance that the meeting would be provocative and had made up our minds not to give them any ammunition. I honestly think we managed very well in this case." (P–17).

The strategy was also reflected in Harold Turner's instructions to his Laurel and Baltimore terminal managers when he told them in late November, 1971:

"We do not want to have Hubler do any repairs if we find that they have not done the proper things on the M–11 write-ups. The reason for this is we are just building the record as to whether it was or was not done." (P–20).

Mr. Spitznagel was dubious about the probability of success in proving a breach of the Agreement by Hubler (P–14, P–99). Mr. Zodrow, however, a CPA and a graduate of law school (tr. 670–671), was determined to obtain documentation relevant to the quality of the maintenance of the leased vehicles by Hubler in order to reach a conclusion as to whether a breach of the Agreement by Hubler could be supported. Mr. Zodrow ordered voluminous records to be kept and cross checked for this purpose.

Among the documentation sought were P & D Failure and Availability Reports for Laurel and Baltimore as well as daily reports from Laurel and Baltimore of M–11 write-ups, of repairs made by Hubler, and of street failures and yard delays. Mr. Zodrow designated Mr. Ahola in his office as the person to receive and correlate the documentation. Acting on Mr. Ahola's suggestions (P–100), Mr. Zodrow arranged for the preparation of the documentation. P & D Failure and Availability Reports for four week periods had been one of the required reports utilized by REX in its ordinary business for several years. Mr. Ahola, therefore, merely had to obtain them from the normal sources in order to utilize them in his assigned task (P–106). The daily reports relating to the M–11's at Baltimore and Laurel, similar to the reports made for Stone in early 1971 (P–11), were specialized reports devised solely for use in examining the possibility of declaring Hubler in breach of the Agreement.

The 1970 and 1971 Laurel P & D Failure and Availability Reports have been received in evidence as D–133(a) through D–133(z). The Baltimore P & D Failure and Availability Reports have been received in evidence as D–135(a) through D–135(c) for the eighth, ninth and the thirteenth periods of 1971. The daily reports relating to the M–11's at Laurel from November 16, 1971

through December 30, 1971, known as "the Pardue Reports", have been received in evidence as D–4 through D–37. The daily reports for Baltimore relating to the M–11's, known as the "Blevins Reports", for the period of November 16, 1971 through December 30, 1971 have been received in evidence as D–40 through D–72. From these documents, together with a summary for Laurel through December 3 (P–102), Mr. Ahola prepared summaries known as the "Ahola Reports", which have been received in evidence as P–114(a) and P–147.

On December 8, 1971 three letters were mailed to Heydon Hubler with copies to Len Savidge. These letters were respectively from Charles Zodrow (P–21), Harold Turner (P–22), and Frank Stone (P–23). In Mr. Zodrow's termination letter of December 29, 1971 (P–29), these three letters were relied upon as the written notices of breach of the Agreement required to be sent under ¶ 8.f.2. thereof.

*IV. Alleged Breaches by Hubler*

*A. Lack of Maintenance*

■ A great amount of time was spent in this trial attempting to prove or disprove, as the case may be, that Hubler was properly maintaining the fleet of leased vehicles. Thousands of pages of exhibits and testimony have been devoted to that subject. The Court has concluded that the respective witnesses for both sides have exaggerated to some extent in presenting the facts relevant to this issue. After wading through all of the evidence, however, the Court has concluded that, for whatever reason, the degree of maintenance to the leased vehicles provided by Hubler in the latter half of 1971 was insufficient to enable REX "to conduct normal business operations" as required by the Agreement. Without attempting to recite all of the evidence which has led to this conclusion, the Court will mention some of the highlights.

Heydon Hubler testified that Hubler's regular preventative maintenance service was performed on all of the leased vehicles systematically at periods of 2,000 miles, 4,000 miles and 6,000 miles (tr. 2649–50).

This contradicts the answer to interrogatory 87 in which it was stated that preventative maintenance work was done every 4,000 miles and every 8,000 miles as well as the answer to interrogatory 53 which indicates that preventative maintenance was done every 2,000 miles and every 6,000 miles. William Shaffer, who was the Laurel service manager for Hubler from August, 1971 through the end of December, testified that preventative maintenance for straight trucks was performed every 4,000 miles and for tractors was performed every 6,000 miles (tr. 1569–70). In addition to the inconsistencies in the plaintiff's case as to the exact nature of the preventative maintenance program at Laurel and Baltimore in the latter half of 1971, there is also a lack of documentary evidence of preventative maintenance work during this period.

Heydon Hubler testified at his deposition that records of preventative maintenance work were regularly kept on 3 × 5 cards (tr. 2620–1). At the trial, he changed his testimony somewhat to state that 8 × 11 "oak tag" cards were kept of the preventative maintenance work on each vehicle and that those cards were permanent records kept with each respective vehicle file (tr. 2620–5). Ronald Hubler testified that there was a card system for each vehicle on which preventative maintenance work orders were supposed to be recorded (tr. 570–8), although he never saw any such cards kept at the Laurel terminal (tr. 571–2). William Shaffer testified that all preventative maintenance work orders were recorded on 6 × 4½ cards at the Laurel terminal (tr. 1571) and that this policy continued through 1971 (tr. 1633). No cards of any kind containing preventative maintenance records for the leased vehicles were presented as evidence. The plaintiff has no explanation for the absence of these cards. The Court infers that they either did not exist or that they would support the defendant's contention that the preventative maintenance program of Hubler in the latter part of the 1971 was non-existent at the Laurel terminal.

The work orders themselves for the various unit files of the leased vehicles show

practically no preventative maintenance work in the latter part of 1971. Since these work orders were four copy documents, it is unlikely that all four copies of the work orders for the various preventative maintenance services which Hubler contends were performed in the latter part of 1971 on the leased vehicles would have been lost. Although Heydon Hubler indicated that the service foreman's log might indicate preventative maintenance work that was done (tr. 2635), William Shaffer stated that preventative maintenance work would not appear on the foreman's "daily service schedule" or log (tr. 1619). The only daily service schedule which has been produced, being the one for Laurel for the period from November 30, 1971 through January 3, 1972 (D–77), in any event shows at most three instances of preventative maintenance being performed during that period.

Mr. Hillard Siegel who appraised the leased vehicles in Baltimore and Laurel for REX on January 10, 1972, testified that a majority of the trucks showed evidence of a lack of grease (tr. 6022). He rated 61 of the leased vehicles as being in "good condition", none in "poor condition". His ratings were qualified by him by stating that although a vehicle can be in good condition for appraisal purposes since only a small amount of money need be expended to place it in safe and operable condition, at the moment of the appraisal it might be unsafe to drive due to a condition such as a leaking master cylinder, a lose spring pin, or too much play in the steering wheel. (tr. 6052–9).

Donald Dawson and Robert Harrison, supervisory maintenance personnel employed by REX (D–186, D–190), examined the leased vehicles in Baltimore and Laurel on December 29, and December 30, 1971. Their testimony, even when viewed skeptically in light of their positions with REX, is basically credible and supportive of the conclusion that the leased vehicles at the time of their examination showed evidence of a lack of preventative maintenance for a substantial period of time (tr. 5378–5828, 5830–5976, D–83, D–84).

The testimony of Herbert Niewender, who appraised the fleet of leased vehicles for Ron Hubler together with a mechanic (tr. 1723–4) on January 7, 1972 (tr. 1735), found the fleet generally to be in good condition. While he stated that he would have written on his appraisal form any conclusion that a particular vehicle had not had preventative maintenance (tr. 1763), the appraisal took place over one week after the termination of the lease during which time Mr. Shaffer testified that the trucks were being put "back into shape" (tr. 1715) which may have meant that they were being lubricated and serviced, among other things.

An inference of lack of maintenance of the leased vehicles has also been drawn by the Court based on the so-called "Savidge work orders". Walter Ball, whose deposition (Paper 66) was received in evidence on March 17, 1976, was the Sales Manager for Hubler. He testified that he ordered a computer study to be made of the Laurel work orders in order to attempt to convince REX that the required maintenance had, in fact, been performed on the leased vehicles. In some cases there were no work orders to correspond with an M–11, which had been initialed by a mechanic to indicate the work had been done, or with an entry on the daily service log. Ball testified that he ordered Len Savidge to prepare work orders to correspond with initialed M–11's or entries in the daily service log in order to assist the key punch operator in the computer study. (Dep. tr. 17–19) and that this procedure was performed by Savidge in Philadelphia in January or February, 1972. The Savidge work orders have been identified by virtue of the fact that they all are work order forms containing the four unseparated parts whereas the four parts of work orders which were filled out in the ordinary course of business were separated immediately after their completion. None of the Savidge work orders for December, 1971 (D–97) correspond with an entry in the daily service log in Laurel for that month (D–77). No initialed M–11 has been produced to correspond with a Savidge work order. The Court infers that the Savidge work orders do not have the basis in fact

ascribed to them by Walter Ball and that they are falsified as contended by the defendant.

The computer study shows a total of 784 M–11's reflecting vehicle defects in September, October, November and December, 1971 (D–92). Of that number, 342 are M–11's corresponding to a Savidge falsified work order. Of the 196 M–11's showing vehicle defects in September, October, November and December of 1970 (D–92), 97 are M–11's for which Savidge prepared a falsified work order. Of the 519 total Savidge falsified work orders, 439 relate to M–11's for the last four months of 1970 or 1971. The Savidge work orders, which apparently reflect M–11's on which no work was performed, relate primarily to the last four periods of 1971 and, to a lesser extent, the last four periods of 1970 in Laurel (342 to 97).

In 1971 the Hubler leased vehicles were approximately 3 years old. In 1974, the replacement vehicles which REX brought into the Baltimore and Laurel terminals at the termination of the Agreement were also approximately 3 years old.

Using the P & D Failure and Availability Reports for Laurel and Baltimore (D–133(a) et seq. and D–135(a) et seq.), the court, after adjusting for the number of vehicles in the P & D fleet in the respective periods, has made comparisons of the number of street breakdowns for the last four periods of the years 1970 through 1974 at Laurel. A similar comparison has been made by the court for Baltimore for the last four periods of 1971, 1973 and 1974. The methodology used was to determine the average number of breakdowns per period for the last four periods in each respective year and then to determine the percentage which that number represented of the number of vehicles in the P & D fleet at Laurel and Baltimore respectively for that period of time. The results are as follows:

### LAUREL

Last Four Periods, 1970 = 18/72 = 25%
Last Four Periods, 1971 = 38/72 = 53%
Last Four Periods, 1972 = 20/52 = 38%
Last Four Periods, 1973 = 20/58 = 34%
Last Four Periods, 1974 = 7/52 = 13%

### BALTIMORE

Last Four Periods, 1971 = 20/29 = 69%
Last Four Periods, 1973 = 7/36 = 19%
Last Four Periods, 1974 = 8/39 = 21%

In the above comparison for Laurel, the court included the entire P & D leased fleet in the percentage for the last four periods of 1971 since the major service operations for both the Laurel and the Baltimore vehicles were conducted through the Laurel garage. If only the Laurel leased vehicles are considered for the last four periods of 1971, then the average number of street breakdowns per period compared with the number of vehicles equals 18/43 or 42%.

It is, of course, true that not all street breakdowns are a result of improper maintenance. Some might be the result of driver abuse or mistake as well as driver "goof offs". Others might be the result of a flat tire caused by a puncture of a tire otherwise free of defects (tr. 1542, 4781). Hubler's Laurel service manager, however, testified that the majority of service calls by Hubler on the leased vehicles were ones in which the unit had actually broken down (tr. 1608).

Although Donald Dawson testified that REX used a standard based upon experience for three year old gasoline fueled vans and tractors of 250 vehicle days between street breakdowns as normal for well maintained vehicles (tr. 5623–27), that standard appears overly optimistic based upon REX's own P & D Failure and Availability Reports for Laurel and Baltimore in the years 1972 through 1974 when REX was maintaining its own leased vehicles. Mr. Dawson's testimony that the street failure rate at Laurel in December 1971, was six times the normal rate (tr. 5628–32) is viewed with a grain of salt by the court. Nevertheless, the street failure rates for the last four periods of 1971, both at Laurel and Baltimore, are in excess of the street failure rates for those subsequent periods when REX performed its own maintenance

of the P & D fleets and are substantially in excess of the street failure rates of the P & D fleets based at Laurel and Baltimore in the comparable period of 1974 when the REX replacement vehicles were approximately 3 years old, the same age as the Hubler leased vehicles in the last four periods of 1971.

An explanation of the substantial drop of the street failure rate at Laurel in the last four periods of 1974 as compared to that which existed prior to that time under both Hubler's and REX's regime might be found in Heydon Hubler's testimony that maintenance costs fluctuate during the lifetime of a truck. He stated that maintenance problems increase from the first to the third or fourth year of the life of the vehicle and then sharply drop to a low point when major components of the vehicle are replaced or repaired after which the maintenance problems and costs gradually build up again (tr. 2562–64). It is possible that the Laurel vehicles in the last four periods of 1974 were in the valley of the maintenance cycle, thereby explaining the dramatic drop in street breakdowns when compared to similar periods in prior years.

Nevertheless, the street breakdown rate for both Laurel and Baltimore for the full years applicable between 1970 and 1974 shows that the breakdown rate for 1971 was considerably higher than at any other time. Using the same methodology as described above, the full year breakdown rates have been computed by the court as follows:

LAUREL

1970 = 16/72 = 22%
1971 = 29/72 = 40%
1972 = 15/52 = 29%
1973 = 16/58 = 28%
1974 = 9/52 = 17%

BALTIMORE

1971 = 19/29 = 66%
1972 = 7/32 = 22%
1973 = 7/33 = 21%
1974 = 9/38 = 24%

The inbound service ratio shown on the terminal income and expense reports (D–142(a) *et seq.*) is the best statistical method of measuring the overall performance of the P & D operation. This ratio is a means of stating the speed with which the items of freight are delivered or picked up, as the case may be. An important factor in this ratio is, of course, the quality of performance of the P & D vehicles. While it is true that the inbound service ratio for Laurel for the thirteenth period of 1971 was the best one from 1968 through the end of 1971 (P–56), the court has concluded that, in the face of the other evidence of poor maintenance of the leased vehicles, and the unusually large numbers of street breakdowns and numerous yard delays, substantially correctly recorded in the Pardue reports, such inbound service ratio is insufficient to support plaintiff's burden of proving that Hubler met the maintenance standard set out in the Agreement. Subsequent to the termination of the Agreement by REX, the inbound service ratio at Laurel declined, after allowances made for the havoc caused by hurricane Agnes in 1972 (tr. 6077–79), to a much better level in 1974 than it was in 1971 (tr. 6083, P–56).

*B. Damage Estimate for REX 11376, Hubler 2311*

Mr. Zodrow's letter (P–21), which is relied upon by REX as a notice of breach, referred to REX unit 11376, also designated as Hubler unit 2311. The letter complained of (1) an alleged inflated estimate of repair by Hubco, a company related to Hubler, (2) the vehicle being out of service for an extended period of time, (3) an unauthorized repair to the vehicle before REX could examine the vehicle itself to determine its liability and (4) a substitution by Hubler of a faulty transmission from another vehicle for a good transmission in REX vehicle 11376 and Zodrow's belief that Hubler would have charged REX for the defective transmission if the transmission change had not been discovered by REX personnel before the wrecked vehicle was towed from Laurel to Allentown.

The vehicle was wrecked through the negligence of a REX driver, and REX, it is clear, admitted its responsibility for paying for the damage to the vehicle (¶ 7.f. of the Agreement, tr. 855, 2843). REX obtained an estimate from a third party for repairs in the amount of $3,171.79, but did not initially advise Hubler that it had obtained said estimate. From the time of the accident in July, 1971 until the vehicle was ultimately repaired, Hubler furnished a substitute vehicle of the same specifications (tr. 856–8). REX suffered no detriment when Hubler supplied it with a substitute vehicle (tr. 859–861, 1558).

Under the working arrangements between REX and Hubler, REX was not obligated to accept a Hubler estimate for work to be done on a vehicle wrecked through the fault of a REX employee (tr. 865–6) and was not obligated to have the vehicle repaired by Hubler provided that there was an agreement between the parties as to the extent of the repairs needed (tr. 2454–58). It was to the advantage of Hubler to have the vehicle repaired as quickly as possible since the repairs would be at the expense of REX and, as long as the wrecked vehicle was unrepaired, Hubler was required to furnish a substitute vehicle at no additional charge (¶ 6.c. of the Agreement).

Although Hubler did remove the transmission from the REX vehicle and replaced it with a faulty transmission from another vehicle, it is pure speculation that Hubler would have attempted to charge REX for repair of the faulty transmission. The fact is that the Hubler estimate ultimately prepared (D–161) for $4,372.42 did not include any charge for a transmission or transmission work.

The Hubler estimate was given to REX personnel at Laurel on October 14, 1971. The REX personnel still did not advise Hubler that it had another estimate. The Hubler organization became agitated when there was no response to its estimate and George Riehle, insurance manager for Hubler, telegraphed Mr. Zodrow on October 27 advising that Hubler intended to begin repairs of the unit the next day on the basis of the Hubler estimate. The next day, through Frank Stone, REX telegraphed Riehle, advising him for the first time that REX had an estimate in the amount of $3,171.79 and stating that Hubler either was to perform the repairs at that price or use an outside vendor (D–161). As previously noted, the wrecked vehicle was discussed at the meeting of November 10, 1971 and, at Riehle's request at the meeting, Harold Turner stated that a REX representative would go to Allentown where the unit then was located to examine it with a Hubler representative in order that an agreed repair amount could be reached and the unit could be repaired. On November 16, 1971 a REX representative met with Mr. Riehle and reviewed the unit. The REX representative found excessive both the Hubler estimate and the estimate which REX had obtained, and no agreement was reached. The unit was repaired by Hubco, the Hubler affiliate. The dispute over the amount due Hubler from REX for the repair was compromised on March 14, 1972, four days after this suit was instituted, when Hubler accepted from REX the sum of $3,171.79 for the repair.

The court concludes that in the series of misadventures concerning repairs of REX 11376, Hubler 2311, the REX personnel were equally at fault with Hubler personnel in not using due diligence to reach a reasonable agreement on the amount of repair work to be done. In any event, Hubler provided a substitute vehicle with the same specifications without additional charge and REX suffered no injury. Even if the wrecked vehicle incident could be said to amount to a breach, which the court finds it is not, the circumstances surrounding the wrecked vehicle would have warranted at most the termination of the lease for that one vehicle, and not the termination of the entire Agreement as to all of the vehicles (¶ 8.a. of the Agreement, tr. 639–640).

### C. Fire Extinguishers

In his letter of December 8, 1971 to Heydon Hubler (P–22), one of the letters which

REX has relied upon as a notice of breach under the Agreement, Harold Turner referred to an alleged obligation on the part of Hubler to install 10 B:C Fire Extinguishers in the leased vehicles. A change in the Motor Carrier Safety Regulations as issued by the U. S. Department of Transportation and Federal Highway Administration, effective July 1, 1971, required trucks used to transport hazardous materials to be equipped with fire extinguishers having a rating of 10 B:C or more, 49 CFR § 393.-95(a)(2).

The Agreement prepared by REX is ambiguous in imposing the responsibility for replacement of fire extinguishers which might become outmoded as a result of changes in governmental regulations subsequent to the date of the original delivery of the leased vehicles. Under ¶ 6.f. of the Agreement labeled "Safety Equipment", Hubler had the responsibility to *deliver* to REX on the *"date placed in service"* each leased vehicle . . . "equipped with lights, reflectors, safety devices and supplies necessary to comply with the statutes and regulations of all governmental entities having jurisdiction; and to maintain at its expense, such lights, reflectors and safety devices." This paragraph of the Agreement contains at its end the following words: "(For expense of additional safety supplies see Lessee covenants, Section 7.c.)".

■ Paragraph 7.c. of the Agreement, also labeled "Safety Equipment", provides that the "Lessee at its expense shall provide replacement of safety supplies for each vehicle (as distinguished from lights, reflectors and safety devices) as is necessary to comply with the laws of all governmental entities having jurisdiction." It is not clear whether a fire extinguisher is a "safety device" or a "safety supply". If the former, there is considerable question under the agreement as to whether Hubler had the responsibility to do anything more than to supply the fire extinguishers which were required at the time of the original delivery of the leased vehicles and to maintain such extinguishers by keeping them in working order. Apparently the terms "safety sup-

ply" and "safety device" do not have any standard definition in the trucking industry (tr. 1168). It is not disputed that the leased vehicles, when originally delivered to REX, met the then existing governmental regulations relating to fire extinguishers although it appears that the original fire extinguishers may have come, at least in part, from the old REX P & D fleet which Hubler purchased (P–124). Faced with the ambiguity in the Agreement, the court believes it appropriate to resolve the ambiguity against that party, REX, which prepared the applicable language.

In addition, there is considerable question whether the regulation requiring 10 B:C fire extinguishers applied to the leased vehicles in any event. The regulation by its terms applied only to trucks used as hazardous commodity carriers. Otto Liipfert testified that REX was a general commodity carrier rather than a carrier of hazardous materials (tr. 1536). There was no persuasive evidence that the subject REX trucks were required to be marked and placarded as hazardous commodity carriers or that, in fact, they were so marked and placarded. See 49 C.F.R. §§ 171.8, 172.101, 177.823(a). Under 49 C.F.R. § 393.95(a)(3), the requirement of a 10 B:C fire extinguisher applied only to those trucks required to be marked and placarded as hazardous commodity carriers.

■ The Court concludes that there was no breach by Hubler in reference to the fire extinguishers.

*D. Substitute Vehicles*

Frank Stone's letter of December 8, 1971 to Heydon Hubler (P–23), also one of the letters relied upon by REX as a notice of breach under the Agreement, briefly referred to an alleged failure of Hubler to furnish substitute vehicles for leased vehicles which were out of service, specifically mentioning an incident on November 15, 1971 concerning a replacement for REX vehicle # 11209.

Paragraph 6.c. of the Agreement required Hubler to furnish a substitute vehicle of

"substantially equivalent type and capacity" "within a reasonable time" after the leased vehicle became inoperable and further provided that *"for each full work day"* that Hubler was unable to provide a substitute vehicle, rental charges on the leased vehicle would abate. It further provided that, although the financial liability of Hubler for failure to provide a substitute vehicle would be limited to the abatement of rental, such limitation was not to relieve Hubler "of its liability under 8.f.2., Breach by Lessor."

There apparently was a disagreement between the parties in 1971 as to the meaning of paragraph 6.c. relating to the time when Hubler was required to provide a substitute vehicle. REX took the position that the substitute vehicle must be provided by 8:00 a. m. (tr. 4191–6, D–177). Heydon Hubler was of the view that the time when a substitute vehicle would be required to be furnished to REX depended upon the circumstances (D–178), and, apparently, no hard and fast rule was ever adopted. The Agreement itself required an abatement of rental only if Hubler failed to provide a substitute vehicle for a "full work day", which the court construes to mean that the Agreement recognized that the substitute vehicle would not always be required to be supplied by 8:00 a. m. in order for Hubler to have fulfilled its responsibilities in that regard.

On January 10, 1972, Don Hargett of REX instructed the Accounts Payable Department to deduct the total of $45.84 from the amount due Hubler for the week ending December 31, 1971 for the alleged failure of Hubler to provide substitute vehicles on September 21, 1971, on November 15, 1971, twice on December 13, 1971, and on December 20, 1971 (P–48). It had been the practice over the course of the lease for the rental billings to be made on a weekly basis and for credits and claims for deductions to be made on a weekly basis as well (Tr. 896–7, 1332–51). The original weekly billings for the periods for which a deduction was claimed in P–48 for alleged failure to provide substitute vehicles were paid by REX without any deductions for failure to

provide substitute vehicles within those periods (tr. 1353–7).

After pouring over the Pardue Reports, the Blevins Reports, P–48 and P–130, the court finds credible support for the failure to provide a substitute vehicle on only one of the occasions alleged. On December 20, 1971, Hubler # 1265, a straight truck, which was a replacement for another vehicle which had broken down, itself became inoperable and, as D–26 states it was "taken off the lease for the day" because no replacement was available. That no replacement was available is corroborated by P–130 which shows that no straight trucks were available on that day to be used as a substitute for Hubler # 1265.

D–33 refers to a lack of a replacement for Hubler # 1212, but the court discounts that statement in view of the fact that no mention was made of the unavailability of a substitute vehicle in the contemporary reports, D–27 and D–28. Similarly, while D–33 refers to the unavailability of a substitute vehicle for REX # 11364 on December 23, 1971, there is no mention of the unavailability of a substitute in the contemporary reports, D–30 and D–31, and the court does not credit D–33 in that regard. D–33 refers also to the unavailability on December 14, 1971 of a substitute vehicle for REX unit # 11233, but the contemporary reports, D–23 and D–21, make it clear that REX unit # 11223, a straight truck, was deadlined on December 13, 1971, a date on which a replacement was available (P–130). On the other dates in question, September 21, 1971 and November 15, 1971, substitute vehicles were available (P–130).

The Blevins Reports demonstrate that substitute vehicles were always supplied in Baltimore when necessary during the time covered by those reports.

### E. Lack of Extra Vehicles

In the "notice of breach" letters of both Harold Turner and Frank Stone (P–22, P–23), reference was made to an alleged failure on the part of Hubler to provide extra vehicles when requested by REX and that

such failure was caused by a removal of extra Hubler units from the Laurel yard.

Under paragraph 6.d. of the Agreement, Hubler covenanted "[t]o provide additional vehicles of substantially equivalent type and capacity to vehicles leased hereunder, *if available*, as requested by [REX] at a daily rental charge . . ." specified therein. (Emphasis supplied).

■ Although the Agreement contemplated that Hubler would domicile in Laurel additional vehicles of substantially the same type and capacity as the leased vehicles, there was no agreement that any particular number of vehicles would be so domiciled by Hubler. In fact, while Hubler indicated that it was ordering a total of 28 additional vehicles of the same specifications as the leased vehicle and that it was its intention to domicile them at Laurel as a part of its daily rental fleet, the parties reached no agreement making it mandatory for Hubler to keep all or any particular part of that number of vehicles at Laurel. The written Agreement stated that it constituted ". . . the entire Agreement between the Lessor and the Lessee". It went on to say in paragraph 8.i. that "[t]here are no oral agreements or understandings affecting this instrument . . .". As previously noted, the basic document was prepared by REX and must be construed most strongly against it. Any subjective hope, expectation or desire on the part of the officials of REX that Hubler would keep all 28 vehicles at the Laurel terminal indefinitely cannot rise to the level of an enforceable contract where such was not the mutual intent of the parties. Hubler had the responsibility to provide extra vehicles from its daily rental fleet under the Agreement to REX only if the vehicles were available.

At the same meeting in October, 1968 at which agreements were reached with reference to fueling of the leased vehicles by

Hubler and repair by Hubler of REX owned vehicles, it was also agreed that REX could have a "weekend special" on extra vehicles which it was leasing for a Monday operation. Under the "weekend special" REX could obtain possession of the extra vehicles at the close of business by Hubler for the weekend in order that the remainder of the weekend could be utilized by REX, without charge, to load the extra vehicles. The daily rental charge would only be collected by Hubler for one day [4] (P–5).

On November 12, 1971, after the meeting on November 10, Leonard Savidge, acting on orders of Heydon Hubler, notified Frank Stone that the "weekend special" was terminated immediately and that REX would be charged for the entire time that it had extra Hubler vehicles in its possession (D–179). This action on Hubler's part was precipitated by Heydon Hubler's perception that REX was attempting to harass Hubler on the matter of fueling and maintenance. Incorrectly, but with some justification, Heydon Hubler took the position that the language of paragraph 5.b.1. of the Agreement required a mutual agreement [5] before REX could change the fueling conditions (P–76). In addition, there had been an agreement, as previously noted, in October, 1968 that Hubler would do the fueling for 3½ cents a gallon and at the same time an agreement had been reached relative to the "weekend special" (P–5). The court infers that Heydon Hubler concluded that if REX could unilaterally change the fueling relationship which had been agreed upon in October, 1968, Hubler could unilaterally refuse to allow REX to continue to have free possession of extra vehicles from Hubler's daily rental fleet on the weekends. The position of REX, however, as articulated by Mr. Zodrow, who at that time was making the ultimate decisions in reference to Hubler for REX, was that REX could unilaterally at any time change the fueling

---

4. If the extra vehicle were not returned to Hubler by 3:00 a. m. on the following Tuesday morning, an additional charge would be incurred.

5. The Agreement provided:

"Provision of and payment for fuel in its placement into the vehicles leased here under may be the responsibility of either Lessor or Lessee, but not both, *as mutually agreed* herein. (delete 5.b.2. or 5.b.3.)." (Emphasis supplied).

agreement reached in October, 1968 but that Hubler could not change the "weekend special" arrangement reached at the same time in October, 1968 (tr. 2802–3, 2860–1).

■ The "weekend special" was not a part of the Agreement. It was at best a collateral agreement between Hubler and REX, the violation of which by Hubler did not and could not constitute a breach of the Agreement by Hubler. The cancellation of the "weekend special" by Hubler did not provide legal justification for a termination of the Agreement by REX.

Although Frank Stone's letter of December 8, 1971 (P–23) ambiguously stated that Hubler "systematically removed [the extra units] from the [Laurel] yard", the Hubler daily utilization reports indicate that there were at least 11 straight trucks and 6 gas tractors of the REX specifications domiciled at the Laurel terminal by Hubler up until the termination of the Agreement by REX. (P–130). In the ninth period, the REX P & D Failure and Availability Report (D–133(v)) for Laurel shows that all requests of Hubler for extras were met. Similarly, the reports for the tenth and eleventh periods do not show that Hubler was unable to supply requested extra vehicles (D–133(w), D–133(x)). Although the report for the twelfth period at Laurel contains a statement to the effect that Hubler has few tractors left at the Laurel terminal that could be leased as extras by REX, the tabulation on that report shows only six times when Hubler was asked to furnish extra tractors and that on those days all demands for extras were met (D–133(y)). The report for the thirteenth period of 1971 at Laurel (D–133(z)) shows that 16 extra straight trucks were requested by REX which were all supplied and that on the first Monday of the period REX requested seven tractors as extras of which Hubler could supply only two.

At Baltimore, the record of extras supplied by Hubler for the twelfth and thirteenth periods of 1971 is not as good. The

modification of the Agreement which allowed the transfer of 29 leased vehicles to Baltimore from Laurel did not modify Hubler's obligation in reference to extra vehicles. Although Mr. Blevins, the Baltimore terminal manager for REX, believed it was Hubler's responsibility to bring extra vehicles to Baltimore from Laurel at the request of REX (tr. 4285–90), the modification of the Agreement imposed no such responsibility on Hubler. Its sole responsibility was to provide extra vehicles, if available, to REX at the Laurel terminal (¶ 6.d. of the Agreement).

In the eighth, ninth, and tenth periods of 1971[6], all extras requested of Hubler by REX from Baltimore were supplied by Hubler (D–135(a), D–135(b), D–130). In the twelfth and thirteenth periods of 1971, it appears that requests were made for extra tractors by REX at Baltimore from Hubler which were not filled (D–132, D–43, D–44, D–45, D–47, D–49, D–53, D–58, D–59, D–63). In at least some of those cases, Blevins chose to lease the tractors from lessors readily available in Baltimore because Hubler refused to bring the extra vehicles from Laurel to Baltimore at Hubler's expense (tr. 4285–90).

■ While the reduction of the number of vehicles of REX specifications in the Hubler daily rental fleet domiciled in Laurel was a source of irritation to REX personnel and, from their viewpoint, another manifestation of a deteriorating relationship which REX officials had decided months before to end if at all possible, there is no evidence at all that Hubler breached the Agreement by failing to provide REX with extra vehicles when such vehicles were available. The court concludes that Hubler was not in breach of the Agreement in reference to the leasing of extra vehicles to REX.

## V. The Gas Pump Chain Incident

When Heydon Hubler received Turner's letter of December 8, 1971 (P–22) he inter-

---

6. The P & D Failure and Availability Report for the eleventh period is confusing in that its totals indicate all extra tractors requested were

supplied, but the weekly breakdown indicates one Wednesday when one requested extra tractor was not supplied (D–131).

preted it as the long awaited final word from REX on the fueling situation at Laurel. Although the position of REX, as announced in Heydon Hubler, from October 18, 1971 had been that REX could add Hubler's supplied oil to the crankcases of the leased vehicles at Laurel if oil were needed at the time REX personnel fueled said vehicles, Turner in his letter stated that REX not only would not be responsible for engine failures but would not check the oil and water levels in the leased vehicles. Heydon Hubler felt that he had acquiesced temporarily in the unilateral revocation of the October, 1968 fueling agreement pending a promised final consideration of the subject by REX. He did so with the understanding that REX would check and add oil and water at fueling times in the interim. He had acquiesced temporarily in the hope that the promised memorandum announcing the final REX consideration of Hubler's position on REX responsibility for engine failure would either be favorable to Hubler's position or would signal a return to the 3½ cent per gallon fueling arrangement in Laurel. Now the Turner letter not only did neither of those two things, but, in fact, it stated that REX would not check and add oil and water at fueling times.

Heydon Hubler went to Laurel when he received the letters from Zodrow, Turner and Stone. He told Savidge to chain the gas pumps and not to allow REX to fuel the leased vehicles (tr. 3212–39). After consulting with his attorney, he telegraphed Turner to advise him that Hubler would resume fueling under the October, 1968 agreement immediately (P–19). He also took the position that Zodrow, in a letter which probably related to negotiations in reference to the fueling in Baltimore when REX was attempting to obtain consent to the transfer of 29 vehicles from Laurel to Baltimore, had agreed that REX personnel would check oil and water levels, add oil and water if necessary, and be responsible for engine failures resulting from failure to do so. Heydon Hubler also dispatched a letter to Harold Turner, responding generally to the three letters which he had received from Zodrow, Turner and Stone, in which

he reiterated that Hubler would resume fueling at Laurel under what he contended to be the 1968 amendment to the Agreement (P–24).

On December 14, Harold Turner fired back a telegram to Heydon Hubler in which he stated that Hubler had misinterpreted his December 8, 1971 letter and the Agreement. Turner's telegram said that he did not understand Hubler's wire of the preceding day and restated the REX position that the "informal agreement" under which Hubler had previously fueled the vehicles had been terminated. He also said that the original Agreement required Hubler to check and add water and oil and that Roadway would "continue to fuel the vehicles at Laurel, Maryland" (P–89). Heydon Hubler, upon receipt of the Turner telegram, the same day sent a telegram to Charles Zodrow, who had received a copy of the original Hubler telegram, stating, in clarification of his telegram of December 13, 1971, that Hubler was rescinding its "temporary agreement" to allow REX to fuel the Laurel based vehicles because Roadway was violating its agreement to check and add oil, and that Hubler, ". . . from this day forward, will provide fueling services as original lease agreement provides." (P–86). The flurry of telegrams ended when Charles Zodrow sent a telegram to Heydon Hubler on December 15, 1971, denying that he had any agreement or had made any promise concerning fuel, oil, or the responsibility for engine failure at Laurel and stating that REX stood by the position announced by Harold Turner (P–87).

In the meantime, back at the Laurel terminal, REX personnel, after a confrontation with Hubler personnel, cut the chains on the gas pumps (tr. 4971–5) and arranged to have the electrical wiring system altered to remove the electrical switches from the Hubler garage (tr. 4976–9). Heydon Hubler decided not to attempt to retaliate further. He decided to try to work the fueling problem out in the meeting which he planned to have with Mr. Zodrow (tr. 3240). REX continued to fuel the leased vehicles.

## VI. The Notice of Breach Letters

As previously recited, the Agreement provided that REX could terminate if Hubler had not cured within 20 days any breach of which Hubler was given written notice by REX ". . . specifying *with substantiating evidence the nature, time, place, circumstances and all other available information* relevant to the breach". (Emphasis supplied). The Zodrow, Turner and Stone letters, all mailed on December 8, 1971, have been relied upon by REX as the required "notice of breach letters" (P–21, P–22, P–23, P–29).

In compliance with Zodrow's strategy, every effort was made by REX, acting through its responsible officials, to camouflage the letters in order that Heydon Hubler would not understand that they were, in fact, the required prelude to a termination of the Agreement.

Zodrow knew that Heydon Hubler was aware of the relative positions of both Harold Turner and Frank Stone in the REX hierarchy. He correctly foresaw that Heydon Hubler would not ascribe to either of those gentlemen authority to terminate the lease. In fact, Mr. Zodrow contemplated that Hubler might think that letters from Stone or Turner were complaints which did not have the authorization of REX officials with final authority in so drastic a circumstance as lease termination (tr. 871).

From those drafts of the letters which were introduced into evidence, it is apparent that Mr. Zodrow orchestrated the preparation of the Stone (P–101, P–108) and Turner (P–109, P–110, P–111, P–112, P–114) letters (tr. 884–6, 1086, 1109, 1112, 1128–1154, 4729–40, 5171–83). Suggestions were made by Mr. Zodrow to word the letters in such a way as to minimize the possibility that Hubler would construe the letters for that which, in fact, they were intended to be, i. e., "notice of breach" letters.

The preparation of the letters began in middle or late November, 1971. A number of drafts were prepared. Instructions were given by Zodrow's office as to the method of mailing of the Turner and Stone letters and the places to which they were to be mailed in order to make them comply with the "notice of breach" provisions of the Agreement. Although the Stone letter was originally intended by Mr. Stone to contain a list (P–102) correlating M–11's with particular trucks and yard delays as well as street breakdowns (tr. 4748–9), Mr. Zodrow ordered the elimination of a specific list and substitution of a less specific summary without the backup material being enclosed.

The Turner letter was prepared in such a way as to appear to be primarily concerned with the promised response of REX to Hubler's position on the change in fueling arrangements at Baltimore. The letter disingenuously commences by stating:

"This letter is in reply to our discussion regarding fueling of the units at our Laurel installation and the question of oil checking and engine responsibility."

In the first paragraph of a memorandum from Mr. Zodrow to Spitznagel on November 30, 1971, there is language which allows an inference that one of Harold Turner's earlier drafts had included language indicating that REX might accept responsibility for engine failures resulting from vehicles running out of oil and water (P–110). The final version of Turner's letter (P–22), denying REX responsibility for engine failures and adopting the position for the first time that REX would not check oil and water at fueling of the leased vehicles, precipitated, as noted earlier, the incident concerning the chaining of the fuel pumps on December 14. Mr. Zodrow also instructed Harold Turner to insert a paragraph in his letter concerning the failure of Hubler to furnish 10 B:C Fire Extinguishers in the leased vehicles.

Mr. Zodrow's letter which, although dated December 6, 1971, was not mailed until the same date as the Turner and Stone letters, appeared on its face to be concerned solely with the wrecked tractor, REX 11376, Hubler 2311. The letter opened by noting that it was prompted by the wire which had been sent to Mr. Zodrow by George Riehle, the insurance manager for Hubler, on Octo-

ber 27. After reciting from the viewpoint of REX the history of the attempts to obtain correct estimates for the repairs to that vehicle, and the contention of REX that the estimate REX had obtained of $3,171.79 ". . . more than adequately covered all of the work that needed to be done", Mr. Zodrow announced his suspicion that Hubler would have attempted to charge REX for the substituted defective transmission had ". . . it not been discovered by Roadway before the vehicle was removed from Roadway's Laurel terminal." Stating that the wrecked vehicle was not yet back in service and that REX did not ". . . contract to lease a substitute vehicle for an extended period, particularly a substitute which was inadequately maintained", Mr. Zodrow stated that ". . . [t]he circumstances surrounding Hubler's failure to meet the terms of the lease in this instance are highly reminiscent of several prior instances involving Hubler overcharges and theft of Roadway property by Hubler employees. I concur with the thinking of our Laurel people that this situation simply cannot be permitted to continue." The "situation" to which Mr. Zodrow referred was not clearly defined, but presumably it related to the failure of the wrecked vehicle to be back in service.

Although Mr. Zodrow testified that he intended his letter to let Hubler know that he was concurring ". . . with what our local people were saying so that [Hubler] wouldn't think it was just—well, as you said before, some unauthorized complaint" (tr. 871), the letter did not refer in any way to the subjects which were set out in the Turner and Stone letters.

*VII. The Meeting of December 22, 1971*

When Heydon Hubler received the Zodrow, Turner and Stone letters on or about December 9, 1971, he, of course, knew that it was not just coincidence that the letters were arriving at the same time. His initial reaction was one of anger. He felt that REX was harassing him and his company. He felt that Hubler was being unfairly treated on the matter of fueling and that

the trucks, while not perfectly maintained, were maintained as well as any fleet lessee could expect (tr. 2501). He was aware that the REX mechanics at Laurel who maintained the line haul equipment had joined a union and were threatening to strike unless they were provided an indoor garage within which to conduct their work (tr. 1230, 1302, 2489–91). Heydon Hubler erroneously concluded that the lower echelon of the REX bureaucracy was trying to convince REX officials in authority to cancel the oral lease which Hubler had on the garage at Laurel in order that the REX mechanics could move inside.

Heydon Hubler went to Laurel on December 11, 1971 and met with Savidge (2497–99, D–162). He looked at some of the leased vehicles which had been mentioned in the Stone letter and which were stationed at Laurel. He observed that some of the repairs referred to in Stone's letter had not been made and he ordered Savidge to see that they were performed. He also ordered Savidge to have the vehicles at Baltimore which were referred to in Harold Turner's letter looked at and to see that the repairs were made, if necessary (tr. 2497–9). He told Savidge to prevent REX from fueling the leased vehicles at Laurel.

Heydon Hubler returned to his home office and consulted his company's lawyer on December 13, 1971 after which the telegram to Turner (P–19) was dispatched and a letter to Turner (P–24) prepared after at least one prior draft (P–132). In his letter, after talking with his attorney, Heydon Hubler decided to go on the offensive and expressly placed REX ". . . on notice of violation of breach of contract . . ." for alleged improper and illegal use of the leased vehicles by operating them in excess of legal weight limits on various dates in 1970 and on one date in 1971. He further decided to replace the terminal manager at Laurel, Len Savidge, in an effort to eliminate personality problems which he believed existed there between Savidge and the REX personnel (tr. 2482–4). Upon determining he should meet with Charles Zodrow to attempt to resolve the problems between REX and Hubler, he called and arrange-

ments were made for a meeting on December 22, 1971 (tr. 1184–5).

The meeting between Heydon Hubler and Charles Zodrow, at which William Ahola was present, was conducted on a pleasant tone. Heydon Hubler told Mr. Zodrow that he felt the local people at Laurel were simply trying to get Hubler out of the garage at Laurel in order to solve REX's labor problems with its own mechanics (tr. 2507, 2919–21). Hubler told Zodrow that there were certain personality problems between the Hubler and REX employees at Laurel (tr. 1077, 1204–5, 2500, 3311–12). He also told Mr. Zodrow he had hired a new manager for Laurel in an effort to solve the "people problems" (tr. 1297, 2500) and that the P & D Fleet in Baltimore and Laurel was "as well kept as any leased fleet could be" and that driver abuse, not bad equipment, was causing any problem that might exist (tr. 2501, 1303). Heydon Hubler suggested that Zodrow come to Laurel to look at the vehicles (tr. 1298, 3313), which Mr. Zodrow declined to do. Hubler further suggested that an independent appraiser be called in to determine the condition of the equipment, and Zodrow indicated that he was awaiting further information to decide what to do (tr. 1306). The recollections of Heydon Hubler and of Charles Zodrow differed on whether or not there was any discussion of a termination of the lease at the meeting. Zodrow testified that Hubler acknowledged that he was aware that the letters he had received were "notices of breach" letters under the Agreement and that he was concerned that REX was attempting to terminate the Agreement. Heydon Hubler denied that any such discussion took place. Charles Zodrow or Mr. Ahola made a memorandum of the discussions of December 22 (tr. 1976–9), and it was referred to in at least one contemporaneous document (P–41). Apparently the memorandum was in existence a short time prior to the trial (tr. 1978). In view of the importance of the meeting and Mr. Zodrow's desire for meticulous records, the court infers that it is almost inconceivable that there would have been no memorandum made by Mr. Zodrow of that meeting.

The memorandum was not produced into evidence by REX. The court infers that the memorandum, if produced, would have contradicted Mr. Zodrow's recollection that termination of the Agreement was discussed at the meeting and that Heydon Hubler recognized the three letters as "notices of breach".

Mr. Zodrow did not show Heydon Hubler at the meeting any of the reports or summaries which he had in his possession at that time nor did he refer to any such reports. He merely said that he was collecting information (tr. 2505–2506).

On December 28, 1971, Mr. Zodrow sent a letter to Heydon Hubler, setting forth Zodrow's "thoughts" regarding the matters set out in Hubler's letter to Harold Turner and the subjects discussed at the meeting on December 22. In the letter Zodrow denied Hubler's allegations and reaffirmed the positions of REX. Even in that letter, no unambiguous references were made to the procedures set out in the Agreement relating to a breach or termination thereof (D–159).

On December 29, 1971, Mr. Zodrow wrote a letter to Heydon Hubler terminating the Agreement as of midnight December 30, 1971 (P–29). On the same day, he sent another letter to Heydon Hubler terminating what he contended to be the oral month to month lease for garage space at Laurel, and requiring Hubler to move its equipment by January 31, 1972. (P–30).

Hubler had its attorney notify REX in accordance with the Agreement that its action constituted ". . . neither proper notice of breach nor proper notice of termination . . .", and that the unilateral action of REX in attempting to terminate the Agreement constituted a breach on the part of REX which Hubler called upon REX to cure. (P–38). A series of letters transpired between lawyers for the parties, culminating in Hubler's termination letter to REX on January 28, 1972 (P–45) after Hubler had again requested REX to cure its alleged default (P–43) and after no agreement was reached on REX's offer to buy

the leased equipment at a lower rate than set out in the Agreement (P–44).

## DISCUSSION AND CONCLUSIONS

### I. The Hubler Claim

As previously noted, the Agreement required Hubler to maintain the leased vehicles "in good repair in all respects, *so as to enable* [REX] to conduct normal operations." (Emphasis supplied). The court has already concluded that the maintenance of the leased vehicles in the latter part of 1971 did not comply with the standard of maintenance required by the Agreement.

The court has also already noted that the Agreement provided that it could be terminated by the lessee in the event of a breach by the lessor only by previously providing to the lessor written notice ". . . specifying with substantiating evidence the nature, time, place, circumstances and all other available information *relevant to the breach*". (Emphasis supplied). The major legal question involved in this case is the effect of that language of the Agreement and whether or not the REX "notice of breach" letters satisfied the requirements of the Agreement.

The parties have agreed that the law of Maryland is the governing law in this breach of contract action.[7]

■ Under Maryland law if a method for termination of a contract, which is outlined in the contract in detail, is not made the exclusive way of terminating the contract, the method referred to in the contract is deemed to be merely a cumulative remedy, and where a breach of the contract is material, the contractually suggested remedy does not bar the use by the injured party of other ordinary remedies for breach of contract. *Foster-Porter Enterprises v. De Mare*, 198 Md. 20, 81 A.2d 325 (1951). It is clearly implied in *Foster-Porter Enterprises v. De Mare, supra,* however, that where the contractually defined method of termination of the contract is made exclusive by

the terms of the contract, such contractually defined method of termination must be complied with in order for a termination of the contract to be valid and effective. *See also Baltimore & Ohio Railroad Company v. Stewart*, 79 Md. 487, 29 A. 964 (1894); *Geiger v. The Western Maryland Railroad Co.*, 41 Md. 4 (1874); *Ryder Truck Rental, Inc. v. National Packing Co.*, 380 F.2d 328 (10th Cir. 1967); *Northwest Water Corp. v. The City of Westminster*, 164 Colo. 61, 432 P.2d 757 (1967); *Carleno Coal Sales v. Ramsay Coal Co.*, 129 Colo. 393, 270 P.2d 755 (1954); 17A C.J.S. *Contracts* § 400.

■ The Agreement here is explicit that it:

". . . [M]ay be terminated [by REX] prior to the aforesaid 'Expiration Date of Agreement' *only* by (i.) breach as stipulated in section 8.f. . . ." (emphasis supplied).

The contractual language can only reasonably be interpreted to mean that the parties intended that REX could terminate the Agreement only if (1) there were a breach of the agreement by Hubler *and* (2) if, after having been given the information required to be given under § 8.f.2.a., Hubler continued the conditions constituting the breach for at least 20 days, *and* (3) REX thereafter sent a written notice of termination in accordance with the Agreement. *See Canaras v. Lift Truck Services*, 272 Md. 337, 353–355, 322 A.2d 866 (1974). In other words, it is not the breach itself that alone justifies the termination of the Agreement, but, under the terms of the Agreement, it is also the failure of Hubler to cure the breach after receipt of a notice setting forth contractually required information which, in conjunction with the breach, justifies termination. *See Northwest Water Corp. v. The City of Westminster, supra; Mad River Lumber Sales, Inc. v. Willburn*, 205 Cal. App.2d 321, 22 Cal.Rptr. 918 (1962); *Carleno Coal Sales v. Ramsay Coal Co., supra* ; 17A C.J.S. *Contracts* § 400, p. 487 and § 404, p. 492. An attempt by REX to terminate

---

7. Plaintiffs' post trial memorandum, page 68, note 15; defendant's post trial memorandum, page 137.

the Agreement without complying with § 8.f.2.a. would render the termination of the Agreement ineffective. Corbin, in his work on *Contracts*, states the rule as follows:

"If a party who has a power of termination by notice fails to give the notice in the form and at the time required by his reservation, it is ineffective as a termination. Its terms and the circumstances under which it is given may be such as to justify the other party in regarding it as a repudiation of the contract with all the effects of a repudiation. [Footnote omitted]." 6 Corbin *Contracts* § 1266, p. 64.

■■■ The purpose of the requirement of the Agreement that REX provide Hubler with "notice . . . specifying with substantiating evidence the nature, time, place, circumstances and all other available information relevant to the breach" was to give Hubler an opportunity to determine whether or not the breach existed and to cure said breach if one did exist. The degree of substantiating information required by the Agreement, along with the duty imposed by the Agreement to send the "notice of breach" letter by certified mail to the principal office of Hubler in addition to the service facility of Hubler, support the reasonable conclusion that the contracting parties intended that an 8.f.2.a. notice not be lost among ordinary business correspondence.

The court concludes from all the circumstances as well as the Agreement itself that Paragraph 8.f.2.a. was intended to minimize the possibility of disagreement between the parties as to whether a breach existed and to maximize the opportunity of Hubler to cure any breach which the "available information" indicated existed. Arguments by REX that Hubler had actual notice of its faulty maintenance of the leased vehicles through complaints and conversations at the local terminal level are unpersuasive. The purpose of paragraph 8.f.2.a. was to put top management officials, and not merely local terminal officials, on notice as to what the specific breaches were alleged to be, and the evidence supporting those allegations, in order that such top management officials could make a judgment concerning whether the breach existed and take effective steps to cure the breach within the specified time limit. The reliance of Roadway on *Berliner Gramphone Co. v. Seaman*, 111 F. 679 (S.D.N.Y.1901) is misplaced. The notice and cure provisions of the contract in that case were expressly stated to be "merely cumulative" so as not to "deprive the [plaintiff] of 'any of its other legal or equitable remedies'." 111 F. at 681–2.

The broad language of the Agreement unambiguously required REX to furnish to Hubler a written notice ". . . specifying *with substantiating evidence* the nature, time, place, circumstances and *all other available information relevant to the breach*." If there were any ambiguities in that language, the fact that REX drafted that part of the Agreement and incorporated in it language which appeared in its standard lease forms (P–3, P–97) would mandate that the ambiguities be resolved against REX. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 356, 322 A.2d 866 (1974); *E. L. Conwell & Co. v. Gutberlet*, 429 F.2d 527 (4th Cir. 1970).

■■■ Since a certain number of breakdowns and yard delays occur irrespective of whether normal and proper maintenance of leased vehicles has taken place, all reasonable information available concerning the number and circumstances of street breakdowns and yard delays as well as the relationship thereof to the M–11's was pertinent information to demonstrate that the maintenance of the vehicles was below the required standards of the Agreement, that such lack of maintenance was resulting in an inability of REX to conduct "normal business operations" and that the breakdowns and yard delays were not caused by driver abuse. That such information was important in this case is demonstrated by the defendant's own witnesses. Mr. Zodrow testified that he and Heydon Hubler might have worked out their problems but that Heydon Hubler "continued to take the position that there was no problem, . .

so . . . [h]ow could I expect we were going to be able to sit down and negotiate something." (tr. 3062). Harold Turner testified that "[w]e couldn't convince Heydon Hubler that we were not getting those trucks repaired" (tr. 5041) and that Heydon Hubler "never did recognize he had a problem" with maintenance (tr. 5088). Turner testified that he and Stone ". . . did a lot of things [in the way of keeping records] on our own for the purpose of showing that something was wrong with . . . the maintenance of those trucks" (tr. 5040–1). Unfortunately, the records which were being kept (other than the M–11's) and which were the basis for the conclusions of Zodrow and others in the REX hierarchy that a maintenance problem existed were never furnished to Hubler. That is not to say that all of the internal records of REX were required to be turned over to Hubler in a "notice of breach" letter. It is to say, however, that a great amount of information existed in the files of REX concerning the inter-relationship of continued driver complaints on the M–11's and the numbers of street breakdowns and yard delays in 1971. Most of that information was not given to Hubler. Such information constituted "available information relevant to the breach" which reasonably should have been provided and could have been provided to Hubler. As pointed out in this opinion, however, the intention of REX was not, as the Agreement required, to give Hubler an opportunity to cure the breach but, on the contrary, was to attempt to comply with a procedure which REX recognized was a requirement of the Agreement without letting Hubler have "all other available information" and, in fact, without letting Hubler know that notices of the breach under the Agreement had been sent to it.

 The termination of the Agreement by REX, after defective "notice of breach" letters had been sent to Hubler, amounted to a repudiation of the contract by REX and placed REX itself in the position of being in breach of the contract. *Northwest Water Corp. v. The City of Westminster, supra; Carleno Coal Sales v. Ramsay Coal Company, supra;* 17A C.J.S. *Contracts,*

§ 404 p. 492. Hubler notified REX of its breach in accordance with the provisions of paragraph 8.f.3. Subsequently, by a letter dated January 28, 1972, Hubler gave notice of termination of the Agreement, purportedly as of February 29, 1972 (P–45). By the date of that notice, it was apparent that REX had no intention of resuming the contractual relationship. Hubler had been notified that the trucks would be placed on the street unless Hubler removed them from REX property on or before January 29, 1972. REX had already made clear to Hubler that it did not intend to follow the Agreement procedure for appraising the leased vehicles since the position of REX was that it was not in breach of the Agreement. (D–196). Under those circumstances, Hubler had no choice but to recognize that the Agreement had in fact already been ended and to assemble its leased vehicles for the purpose of making the best use of them that it could in order to mitigate its damages.

 In view of the fact that Hubler did, however, state February 29, 1972 as the "termination date" under the Agreement, the Court believes that that date should be the one utilized in accordance with "Schedule A" to compute the "agreed value" from which the "fair market value" is to be deducted pursuant to paragraph 8.f.3.b. Since REX did not comply with Hubler's request that a third appraiser be appointed to assist in the determination of the fair market value of the leased vehicles pursuant to paragraph 8.f.5. of the Agreement (P–37) and since the vehicles had been dispersed by or prior to February 29, 1972 as a result of the demand of REX that the vehicles be removed from the REX property, the Court believes it fair that the appraisals of Mr. Siegel, made on January 10, 1972, and of Mr. Niewender, made on January 7, 1972, be considered to be appraisals as of the "termination date". Under the circumstances, REX cannot take advantage of its own wrongdoing to contend that the appraisals should have been made as of February 29, 1972 when its own actions prevented that from occurring by refusing to agree to the designation of the third appraiser contemplated by the Agreement.

Although REX has objected to utilizing Mr. Niewender's appraisal on the basis that his appraisal was not made based on "cash wholesale market value", the requirement of paragraph 8.f.5. of the Agreement, the court has concluded that, under the circumstances, the objection is without merit.

In his testimony, Niewender testified that he deducted certain amounts from the appraisals of each truck for the cost of placing them in "resalable retailable condition" (tr. 1754–5). He also testified that he placed his value on the trucks based on the "market for the vehicles at the time" . . "what someone is willing to pay for it" (tr. 1770) and that he knew what the market was for the vehicles, because he had similar ones in his inventory as a truck dealer or had sold similar ones (tr. 1771). He further testified that he took into consideration that the 72 similar vehicles would have to be disposed of in a group and that this lowered his appraisal (tr. 1772). Although he testified that he put a bid in on the trucks for himself which was lower than the appraisal because he expected a "quantity discount" if he bought the trucks on an "as is, where is" basis, the use of his higher appraisal as a basis for computing the Hubler damages cannot be prejudicial to REX since the higher appraisal figure would reduce the damages under the Agreement. Mr. Siegel, who appraised the trucks on the request of Charles Zodrow (P–40), testified that "cash wholesale market value" is "the value that I place on a truck, that I would bring these trucks in knowing that [they] would be run through my shop in order for resale and I would do mechanical work on them, paint work, to bring them up to standards that I set for myself to resell these vehicles." (tr. 6045). Niewender's testimony that he made a standard deduction of $500 on tractors and straight trucks to cover the same basic areas in his estimate (P–53) as Siegel did in his places the two estimates on a substantially comparable basis.

Since the third estimate of fair market value contemplated by paragraph 8.f.5. of the Agreement was prevented from being obtained by the refusal of REX to have the same made, it is not unfair to determine "fair market value" by averaging the two appraisals which were obtained. The resulting "fair market value" is $168,262.50.

The "agreed value at termination date", has been computed by the court by taking the values set out in P–35, the plaintiff's calculation, and adjusting them in accordance with "Schedule A" of the Agreement to reflect a termination date of February 29, 1972, instead of December 31, 1971. The adjusted "agreed value" as of February 29, 1972 of the total fleet is $339,062.04. Deducting from that the "fair market value" of the leased vehicles leaves the sum of $170,799.54 as the liquidated damages due to Hubler under the Agreement.

Hubler has also sued to recover monies it alleged to be due it under certain unpaid invoices (P–48). As previously stated, the court has found that a replacement vehicle was not furnished as required by Hubler for a straight truck on December 20, 1971, but that replacement vehicles were furnished by Hubler for the other dates set out on the Hargett memo of January 10, 1972 which was the basis for a deduction made by REX from the billings of the week of December 31, 1971. Accordingly, $37.37 of the deduction by REX was unjustified. As to the other invoices contained in P–48, the court concludes that Hubler has not met its burden of proof.

Although Hubler has requested punitive damages, punitive damages may not be awarded in a pure action for breach of contract as this. *General Motors Corp. v. Piskor*, 281 Md. 627, 638–9, 381 A.2d 16 (1977); *Siegman v. Equitable Trust Co.*, 267 Md. 309, 297 A.2d 758 (1972); *St. Paul at Chase v. Mfrs. Life Ins.*, 262 Md. 192, 278 A.2d 12 *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971).

While punitive damages are not payable to Hubler, simple interest at six percent per annum on the liquidated damages sustained by Hubler is an element of damages to which Hubler is entitled. *A. & A. Masonry v. Polinger*, 259 Md. 199, 269 A.2d 566 (1970); *Affiliate Distillers Brands Corp. v. R. W. L. Wine & Liquor Co.*, 213 Md. 509, 516, 132 A.2d 582 (1957). The

court has calculated that sum from March 29, 1972 to date as $66,373.17.

## II. REX's Counterclaim

REX has filed a multi-count counterclaim. Counts II, III, IV (partially) relate to claims not directly dependent upon the validity of the REX termination of the Agreement. Count II is a claim for tortious conversion by Hubler of REX fuel. Count III is a claim for fraudulent overcharges by Hubler for parts and service. Count IV is a claim for $2,143.87 for damages allegedly caused by Hubler to the Laurel garage facility.

Based upon the testimony and exhibits, the court has little doubt that REX fuel was converted by Hubler employees at Laurel under the stewardship of Kenneth Vining. The court is unable to conclude that the conversion of fuel was condoned or approved by Hubler home office management.

Elmer Isenhart was the night foreman for Hubler for a period of time in late 1969 and early 1970 (Isenhart Deposition, Paper No. 92, page 10).[8] He testified that 99% of the fueling was done at night while he was the night foreman (Dep., p. 59). He further testified that Kenneth Vining ordered him to fuel the Hubler daily rental vehicles at the fuel pumps of REX even when REX had not used those vehicles on that day. Vining also told Isenhart to conceal what he was doing (Dep., pp. 28–35, 51–54). According to Isenhart the vehicles were fueled at a rate of approximately 20 to 30 gallons per vehicle (Dep., p. 31) and between zero to three Hubler trucks were fueled surreptitiously with REX gas every night of the five night week (Dep., p. 60).

The REX study of fuel loss, initiated by Frank Stone in 1970, produced evidence that on some days two fuel tickets would be filled out for the same day, one bearing the Roadway unit number and the other bearing the comparable Hubler unit number for the same truck (e. g., D–168, D–169). Evidence also was developed by Frank Stone that on occasion fuel tickets appeared with

a Hubler daily rental fleet number when REX had not used that particular vehicle that day. Frank Stone concluded that approximately 5600 gallons of fuel had been used over a 5 month period in 1969 and 1970 for purposes which REX had not authorized. Adjusted to a yearly basis, the figure is 13,440 gallons or 258 gallons per week.

From this and other evidence, the court has inferred that fuel conversion took place on Vining's orders on a systematic basis from approximately October 1969 until REX began interrogating Hubler employees on the matter in June, 1970.

Since the information as to how much fuel was converted by the agents of Hubler should have been within the records of Hubler as it had complete control over the fueling system at that time, REX does not have to show with precision the precise amount converted. It must show only a basis for determining damages with reasonable certainty. *Masano v. Albritton*, 245 Md. 423, 226 A.2d 299 (1967). Where the nature of the wrongdoing precludes the ascertainment of the amount of the damages with certainty, the wrongdoer cannot complain about the lack of exactitude of which the wrongdoer is the cause so long as the extent of the damages is shown by the evidence as a matter of just and reasonable inference. *Bangor & A. R. Co. v. Brotherhood of Loc. Fire & Eng.*, 143 U.S.App.D.C. 72, 82, 442 F.2d 812, 822 (1971). The court concludes that it can be inferred with reasonable certainty that approximately 258 gallons per week for the period from and including October, 1969 through the first of June, 1970, were converted by Hubler's agents for a total fuel conversion of 9,030 gallons. Multiplied times the then average price per gallon of fuel of 22.4 cents plus the pumping charge of 3½ cents per gallon, the total damages for fuel conversion equals $2,347.80.

The court has carefully considered the claim in Count III of the REX counterclaim for fraudulent overcharges for parts and services. Although the testimony of

---

8. Hereafter, references to this deposition, which was received in evidence, will be made as "Dep., p. ").

Donald Bolton (tr. 4872–9) could form a basis for finding Hubler liable for overcharges for parts, there is no reasonable basis in the record for the court to assess damages even if it were to make such a finding. Similarly, the court concludes that there is insufficient evidence in this record to establish a basis upon which damages could be assessed on any of the other claims of overcharging by Hubler even if the court were to find that such occurred on anything other than an isolated and occasional basis.

On Count IV, the only evidence offered on damages caused by Hubler to the Laurel garage facility was an invoice from Belsinger Maintenance Corp. (D–180). REX's counsel, however, indicated that it was not pressing a claim on that invoice (tr. 4556–4557). While there was evidence that the fuel pumps were locked for part of one day, there is no basis in the evidence upon which to award REX damages for the same. Roadway did not press its claim for removal of the radios in the leased vehicles, apparently, because of a letter from Jack Mears of REX to Hubler in November, 1968 indicating that Roadway was responsible for removal of the radios at the end of the lease (P–74).

■ As to the other damages requested in the REX's counterclaim, the Court believes that they all are claims for breach of the Agreement. While paragraph 8.f.2.b. of the Agreement gave REX the right to terminate the contract in accordance with paragraph 8.f.2.a., such right of termination was ". . . without prejudice to such other remedies as [REX might] have for [Hubler's] breach of the Agreement." If the contract had been properly terminated pursuant to paragraph 8.f.2.a., REX had the right, in addition to the termination of the contract, to exercise any other remedies available to it against Hubler. Even if Roadway had not terminated the contract, it could have sued Hubler for damages for alleged breaches of the contract. No provision of the Agreement *required* REX to terminate the contract even if it believed Hubler was breaching the Agreement. If, however, REX chose to terminate the contract, it had to do so in accordance with paragraph 8.f.2.a. If REX improperly ter-

minated the contract and persisted in its position that the contract was terminated, its action would be, as it was, a repudiation of the contract. The refusal of REX to continue its own performance under the contract was unjustified in view of its failure to comply with paragraph 8.f.2.a. of the Agreement.

■ Performance of the contract by parties suing on it is a condition precedent to recovery. *Wichhusen v. Spirits Co.*, 163 Md. 565, 163 A. 685 (1933). Where a contractual duty is a condition precedent to recovery, non-performance of the condition bars recovery. *Laurel Race Course v. Regal Construction Co.*, 274 Md. 142, 333 A.2d 319 (1975). Having failed to properly terminate the Agreement under paragraph 8.f.2.b., REX is in a position analogous to one who has unjustifiably rescinded a contract. Such a party cannot prevail on a breach of contract action. *Macon v. Zeiler*, 233 Md. 160, 195 A.2d 687 (1963). As stated in Corpus Juris Secundum:

"The injured party's determination that there has been a material breach, justifying his own repudiation, is fraught with peril, since should such determination, as viewed by a later court in the calm of its contemplation, be unwarranted, the repudiator himself will have been guilty of material breach and himself have become the aggressor, not an innocent victim." 17A C.J.S. *Contracts* § 422(1), p. 519.

REX may not recover on the contract portions of its counterclaim.

■ The court also concludes that REX is not entitled to punitive damages on its tort counterclaim. Since the court has determined that the headquarters personnel of Hubler were not aware of the tortious actions of Kenneth Vining in converting the fuel of REX during the time those depredations were being carried on and has further found that Hubler did not ratify those acts but, on the contrary, fired Vining when there appeared to be some substance to the charges made against him, the court believes that the actions of Hubler cannot be characterized as a "wanton or reckless disregard for the rights of others", *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 532, 366

A.2d 7, 13 (1976), or an "extreme reckless-ness or utter disregard for the rights of others", *General Motors Corp. v. Piskor, supra* 281 Md. at 634, 381 A.2d at 20. No actual or implied malice on the part of Hubler against REX has been proven.

Since, however, Hubler did benefit from the thefts conducted under the depredations of Vining, the court is of the view that it is appropriate for Hubler to be required to pay interest on the value of the converted fuel and the improperly paid pumping charge at six percent per annum simple interest from the first day of June, 1970 until this date. See 8 M.L.E., "Damages", ⟷54. Said sum has been computed by the court to be $1,169.40.

Judgment will be entered in favor of Hubler against REX in the total sum of $237,210.08. Judgment will be entered in favor of REX against Hubler on the counterclaim in the total sum of $3,517.20. Each side will pay its own costs.